Larry J. GRANT, Plaintiff,

v.

JOHN HANCOCK MUTUAL, LIFE INSURANCE CO., et al., Defendants.

No. CIV.A.00–12186–JGD.

United States District Court, D. Massachusetts.

Jan. 8, 2002.

Matthew Cobb, Law Firm of Matthew Cobb, Boston, MA, for Plaintiff.

Harry T. Daniels, Danielle Y. Vanderzanden, Hale and Dorr LLP, Boston, MA, for Defendants.

### *MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

DEIN, United States Magistrate Judge.

## I. INTRODUCTION

This matter is before the court on Defendants' Motion for Summary Judgment (Docket # 46). The plaintiff, Larry Grant ("Grant"), has brought suit against John Hancock Life Insurance Company ("Hancock") and two Hancock security officers, John Glancy ("Glancy") and Steven O'Brien ("O'Brien"), alleging constitutional and common law claims resulting from Grant's initial employment with Hancock, a physical altercation between Grant and the security officers shortly after the termination of his employment with Hancock, and the subsequent criminal prosecution of Grant for assault and battery. Fourteen claims are being pressed against the defendants:[1] claims under 42 U.S.C. § 1983 against Glancy and O'Brien (Count I), against all three defendants (Count II), and against Hancock alone (Count III); common law claims for malicious prosecution (Count V), assault (Count VI), battery (Count VII), civil conspiracy (Count XII), intentional infliction of emotional distress (Count XIII), and false imprisonment (Count XV) against all defendants; a claim under the Massachusetts Civil Rights Act against all defendants (Count VIII); and claims of negligence (Count IX), negligent infliction of emotional distress (Count XIV), promissory estoppel (Count X), and fraud or deceit (Count XI) solely against Hancock.

For the reasons detailed herein, the motion for summary judgment is ALLOWED IN PART and DENIED IN PART.

## II. STATEMENT OF FACTS[2]

### *Grant's Employment at Hancock*

Larry Grant began working for John Hancock Life Insurance Company in July

---

**1.** Count IV, a claim under 18 U.S.C. § 1962(d) (RICO) was dismissed under Fed. R.Civ.P. 12(b)(6) by Judge Nancy Gertner on April 25, 2001.

**2.** In accordance with Local Rule 56.1, defendants filed a statement of undisputed facts (Docket # 49) ("DF") along with an Appendix ("App."). Because this court considers the facts in the light most favorable to the plaintiff, and accepts all reasonable inferences in favor of the plaintiff, the court generally will cite to the plaintiff's response (Docket # 65) ("PF") and his Appendix ("App."). To the extent that there are significant disputes as to any material facts, those disputes will be not-

of 1996. (PF ¶ 13). Grant contends that during the interview process he had been promised that his job duties would not include actuarial modeling using a software program called "PTS," a fact which Hancock disputes. (PF ¶¶ 3, 6, 10; DF ¶¶ 20–27). It is undisputed that Grant was immediately assigned duties involving PTS modeling. (PF ¶ 14; DF ¶ 28). Grant allegedly voiced complaints about having to perform this work beginning in December 1996 (PF ¶¶ 17, 18, 21), but was nevertheless given other projects involving PTS modeling. (PF ¶¶ 18, 20, 25). In the Spring or Summer of 1998, Grant began seeking work elsewhere, and eventually secured a position with another employer to begin on September 14, 1998. (PF ¶¶ 31, 34; see DF ¶ 28).

### Termination of Grant's Employment and Altercation with Hancock Security Officers

On September 1, 1998, Grant allegedly informed his Hancock supervisor, William Hines, that he was resigning and that his last day of work would be September 11, 1998. (PF ¶¶ 30, 35–38). He sent an e-mail to Hines on September 2, 1998, stating that his "resignation will commence as of September 1, 1998." (DF App. at 187; PF ¶ 41). Grant did not report to work on September 8 and 9, 1998 due to illness. (PF ¶¶ 42, 44). On September 11, 1998, Grant reported to work, he claims for the purpose of collecting his personal belongings. (PF ¶ 45). It is undisputed that on the afternoon of September 11, 1998, Hines told Grant that he was immediately terminated due to unexplained absences, and instructed Grant to collect his belongings and leave. (PF ¶¶ 48, 51; DF ¶ 32).

After Grant had packed some of his belongings from his cubicle, Hancock security officer Steven O'Brien told Grant that

Grant's bags would have to be searched before Grant could leave. (PF ¶¶ 52–54). When Grant refused to let O'Brien search his bags without a police officer present, O'Brien summoned his supervisor. (PF ¶ 56). Grant was allowed to leave and told O'Brien's supervisor that he would soon return to collect the balance of his possessions. (PF ¶¶ 57–58). Grant went home, dropped off his personal belongings and then returned to the Stuart Street entrance at Hancock, as he had been instructed by O'Brien's supervisor. (PF ¶¶ 58–59). When Grant returned, he was escorted to his cubicle by O'Brien and John Glancy, another Hancock security officer. (PF ¶ 59). At Grant's cubicle, Grant began to retrieve his belongings and then tried to close down a computer application. (PF ¶ 63). The precise details as to what occurred next are in dispute, although it is undisputed that Grant and the security officers got involved in a physical altercation which resulted in Grant being arrested without a warrant and taken to the police station, where he was booked, processed and released. That evening, Grant went to Brigham and Women's Hospital, where he received a physical and psychological exam and then was released. (DF ¶¶ 44, 67).

According to Grant, at his cubicle, while he was trying to shut down his computer, Glancy told him not to use the computer, struck Grant in the arm, and then turned off the computer. (PF ¶ 64). Grant then used the telephone at the cubicle to call directory assistance to get the number for a police station, and was told by Glancy that "I am the police," "I am the Boston Police, I work for the Boston Police Department." (PF ¶¶ 67, 69). See also Incident Report completed by Glancy where Glancy wrote "SO Glancy informed Mr.

ed. Additional facts will be provided in the analysis sections as needed.

Grant he was a Special Officer." (DF App. at 216). In fact, Glancy is a Boston Special Police Officer. (PF ¶ 80).

According to Grant, during the altercation Glancy told Grant he was trespassing. (PF ¶ 68). While Grant was holding the phone, Glancy grabbed Grant, hung up the telephone, pushed Grant onto the desk, hit Grant several times, and sprayed him with pepper spray. (PF ¶¶ 70–73). According to Grant, Glancy and O'Brien threw Grant to the floor, and O'Brien put him in a headlock while Glancy held his arms and handcuffed him. (PF ¶¶ 74–75, 77). After cuffing Grant, Glancy again hit Grant in the face and sprayed him with pepper spray. (PF ¶ 78). O'Brien jumped on Grant's back with his knees. (PF ¶ 79). The Boston police were called to the scene, and Grant was taken to the police station where he was booked and released. (PF ¶ 81, DF ¶ 42).

### Grant's Criminal Prosecution

Grant was arraigned on September 15, 1998 for assault and battery, at which time he was represented by counsel. (PF ¶ 84; DF App. at 218). By November 1998, Grant, through his then counsel, informed Hancock of Grant's intention to sue Hancock. (PF ¶ 85). Grant was tried for five days, ending on April 6, 1999, for assault and battery. (DF ¶ 53). The trial ended in a hung jury. (*Id.*) Grant was tried again and was acquitted on November 8, 1999. (DF ¶ 64). Grant was represented by new counsel during this trial. (*See* PF ¶ 92). Grant contends that the Assistant District Attorney who prosecuted both cases, Corey Flashner, took the position that the criminal action would be dropped if Grant released all of his claims against Hancock. (*See* PF ¶¶ 85–101). Grant contends that Karen Morton, Vice President and Corporate Counsel for Hancock, knew that the claims against Grant were baseless, yet continued to pursue them in an attempt to get a release from Grant. (*See* PF ¶¶ 85, 94). Grant also contends that Hancock assisted the State in prosecuting him and in helping prepare the State's case against him. (PF ¶ 101). Hancock strenuously denies that it offered to drop any claims in exchange for a release or that it was in any way responsible for the decision to pursue the criminal prosecutions of Grant. (*See* DF ¶¶ 50–63). Rather, it is Hancock's position, that the District Attorney's Office alone made the decision to prosecute. (*Id.*)

## III. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996) (citations omitted). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational fact finder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (citations omitted).

Therefore, to prevail on a motion for summary judgment, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). In order to defeat the entry of summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to

require a choice between the parties' differing versions of the truth at trial." *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (internal quotations and citations omitted).

## B. *Claims Under 42 U.S.C. § 1983*

Grant has brought three separate counts under 42 U.S.C. § 1983. Count I arises out of the altercation on September 11, 1998 and is against Glancy and O'Brien only. Count II is based on claims of malicious prosecution, and is against all three defendants. Count III, against Hancock only, is based on an alleged conspiracy between Hancock and the District Attorney's Office in connection with the criminal prosecutions brought against Grant. For the reasons detailed herein, the motion for summary judgment is denied as to Count I and allowed as to Counts II and III.

■ Section 1983 provides a federal cause of action to redress violations of the constitution or of federal rights. It provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "There are two essential elements of an action under section 1983: '(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States.'" *Martinez v. Colon,* 54 F.3d 980, 984 (1st Cir. 1995) (quoting *Chongris v. Board of Appeals,* 811 F.2d 36, 40 (1st Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987)). The defendants have moved for summary judgment on the grounds that Grant has failed to establish either of these elements.

## 1. *Count I—The Altercation With Glancy and O'Brien* [3]

The defendants seek summary judgment on the claim against Glancy and O'Brien relating to their conduct with regard to their altercation with and the subsequent arrest of Grant, on the grounds both that Glancy and O'Brien are private individuals and not state actors, and that Grant has not established any violation of his constitutional rights. There are disputed facts as to both of these elements, and, therefore, the motion for summary judgment as to Count I is denied.

### *State Action—Glancy*

■ It is undisputed that Glancy was a Special Police Officer for the City of Boston at all relevant times, as well as being a private security guard for Hancock. Resolving whether he was acting under color of state law at the time of the altercation and arrest of Grant requires "an assessment of the totality of the circumstances, in which we must consider both 'the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties.'" *Zambrana–Marrero v.*

---

**3.** The parties treat Count I against Glancy and O'Brien as dealing only with the altercation and arrest of September 11, 1998, and the court will too. Unfortunately, the scope of each count is not that clearly defined. To the extent that Count I is read to encompass the post-arrest prosecutions of Grant, such a claim is addressed in connection with Count II below.

*Suarez–Cruz,* 172 F.3d 122, 125 (1st Cir. 1999) (quoting *Barreto–Rivera v. Medina–Vargas,* 168 F.3d 42, 46 (1st Cir.1999)) (additional citations omitted). " 'The key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law.' " *Parrilla–Burgos v. Hernandez–Rivera,* 108 F.3d 445, 449 (1st Cir.1997) (quoting *Martinez,* 54 F.3d at 986). Where there is conflicting evidence, it is not for the court to engage "in its own weighing" but, rather, the issue is appropriately put to the jury. *Zambrana–Marrero,* 172 F.3d at 129. That is the situation here.

■ At the time of the altercation, Glancy was a Boston Special Police Officer specifically authorized to serve as such on Hancock's premises. (PF App. at Ex. 7—Glancy depo. at 22; PF App. at Ex. 6—Petition for Special Police Officer). According to Glancy, this appointment granted him the power of arrest on Hancock property in accordance with "Rule 400" of the "Boston Police guidelines for special police officers." (PF App. at Ex. 7—Glancy depo. at 23). Reports of incidents in which Glancy used handcuffs as part of his security detail at Hancock were regularly sent to the Boston Police Department. (PF App. at Ex. 7—Glancy depo. at 9–10).

During the altercation with Grant, Glancy admittedly portrayed himself to Grant as a police officer. (*See* DF App. at 216). Grant testified that Glancy told him that "he was the Boston police and that he worked for the Boston Police Department" as he threatened to arrest Grant for trespassing. (PF App. at Ex. 2—Grant depo. at 242). Glancy testified that he did, in fact, arrest Grant for assault and battery. (PF App. at Ex. 7—Glancy depo. at 24). Glancy completed an Incident Report at the police station, which describes the "type of incident" as "Assault & Battery Arrest." (DF App. at 216). Glancy is listed as the "victim" as well as the "reporting officer." (*Id.*) In the Boston Police Department Arrest Booking Form, "John F. Clancy [sic]" is listed as the "Arresting Officer" and his status is described as "SPEC 00217."[4] (PF App. at Ex. 6). In addition, Glancy (improperly listed as Clancy) is identified as having read Grant his rights. (*Id.*) The booking officer was a Boston Police Department Officer. (*Id.*)

In cases involving private security guards who perform some police functions, "courts find state action when state or municipal police wrongfully arrest and/or otherwise mistreat a citizen while acting in cooperation with a private security officer with whom they share a 'symbiotic relationship.' Also, courts find state action when a private actor, upon whom the state confers limited legal authority, actually uses that authority when engaging in the conduct complained of." *Fusco v. Medeiros,* 965 F.Supp. 230, 249 (D.R.I.1996) and cases cited (emphasis omitted). Grant's allegations against Glancy in this count stem directly from the altercation and arrest, during which Glancy represented that he was using the authority granted him as a Special Officer. There is sufficient evidence to leave it to the jury to determine whether Glancy was acting under color of state law.

### State Action—O'Brien

Despite not having personally exercised the power of arrest, O'Brien's participation in the seizure of Grant may be sufficient for a jury to conclude that he, too, should be deemed to be a state actor in connection with the altercation with and arrest of Grant. Assuming, *arguendo,* although the record is not clear, that O'Brien is not a

---

**4.** Presumably this means Special Police Offi- cer with badge number 217.

Special Officer too, there is still enough evidence which, if credited by the jury, may establish his liability under § 1983.

■ A showing that a private party and a state actor jointly deprived an individual of his civil rights exposes the private party to liability under § 1983, as the private party is also considered to be acting under color of law. *See Alexis v. McDonald's Restaurants of Massachusetts, Inc.,* 67 F.3d 341, 351 (1st Cir.1995). Grant has provided evidence that O'Brien assisted Glancy in holding Grant, was instructed by Glancy to "lay [Grant] out" on the floor, and restrained Grant until the police arrived on the Hancock premises. (PF ¶¶ 74–77, 79, 82). Because Glancy may be considered a state actor in arresting Grant, evidence of O'Brien's joint activity may "pull [him] inexorably into the grasp of § 1983." *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 253–54 (1st Cir.1996).

### Evidence of Constitutional Violations

The defendants also move for summary judgment on Count I on the grounds that Grant has failed to establish a constitutional violation, the second element of an action under § 1983. However, this argument fails as there are sufficient facts from which a jury can determine that Glancy and O'Brien violated Grant's Fourth Amendment rights, both because he was arrested without probable cause and because the defendants used excessive force.

■ The Fourth Amendment requires that warrantless arrests be based on probable cause. *See Gerstein v. Pugh,* 420 U.S. 103, 113–14, 95 S.Ct. 854, 862–63, 43 L.Ed.2d 54 (1975); *Alexis v. McDonald's,* 67 F.3d at 349, and cases cited. Probable cause is established with evidence demonstrating that "at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant

a prudent person in believing that the defendant had committed or was committing an offense." *U.S. v. Bizier,* 111 F.3d 214, 217 (1st Cir.1997) (internal citation omitted). The defendants claim no Fourth Amendment violation can be shown, because a reasonable person would have believed that Grant had committed or was about to commit a crime when he was arrested since he "exceeded the scope of his permission to be in his cubicle and at John Hancock." (Def. Mem. at 14). *See Atwater v. City of Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 1557, 149 L.Ed.2d 549 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender"). Grant, however, claims that he was acting within the license granted by Hancock to collect his belongings. (*See* PF ¶ 65). He also claims that since he was arrested for assault and battery, the relevant inquiry is whether there is sufficient cause to arrest for that crime, not trespass, on which Hancock seems to rely. That issue does not have to be resolved at this juncture. Given the parties' totally different versions of events as to what occurred when Grant returned to his cubicle with Glancy and O'Brien, it is clear that the existence of probable cause for the arrest is disputed. Therefore, the § 1983 claim for Fourth Amendment violations with regard to an arrest without probable cause survives the motion for summary judgment.

■ Similarly, Grant has stated a constitutional claim based on the force used by Glancy and O'Brien. "[A] viable excessive force claim must demonstrate that the police defendant's actions were not objectively reasonable, viewed in light of the facts and circumstances confronting him and without regard to his underlying intent or motivation." *Alexis v. Mc-*

*Donald's,* 67 F.3d at 352. The facts surrounding the physical altercation are very much in dispute. The facts as alleged by Grant are sufficient to state a claim of excessive force, and, therefore, the question is one for the jury.

In sum, since a reasonable jury may find that the defendants Glancy and O'Brien acted under color of state law and violated Grant's Fourth Amendment rights in connection with the altercation and arrest on September 11, 1998, the defendants' motion for summary judgment on Count I of the Complaint is denied.

### 2. *Count II—Malicious Prosecution*

In Count II, Grant alleges a violation of 42 U.S.C. § 1983 against Hancock, Glancy and O'Brien based on a violation of his "procedural due process rights, including abuse of process, malicious prosecution, malicious abuse (use) of process." For the reasons detailed herein, summary judgment shall be entered in favor of the defendants on Count II, as Grant has failed to allege a constitutional violation sufficient to sustain a claim under § 1983.

 To survive summary judgment, Grant must establish not only the elements of his underlying tort claims of improper use of process or malicious prosecution, but both state action and a deprivation of constitutional rights as well under § 1983. *Nieves v. McSweeney,* 241 F.3d 46, 53 (1st Cir.2001). *See also Meehan v. Town of Plymouth,* 167 F.3d 85, 88 (1st Cir.1999). However, the record, as a matter of law, does not state a deprivation of constitutional dimension. It is well established that a " § 1983 claim for malicious prosecution as a deprivation of procedural due process is barred where, as here, the state's tort law recognizes a malicious prosecution cause of action." *Meehan v. Plymouth,* 167 F.3d at 88, and cases cited. Similarly, "[t]here is no substantive due

process right under the Fourteenth Amendment to be free from malicious prosecution." *Id.* (quoting *Roche v. John Hancock Mut. Life Ins.,* 81 F.3d at 256) (additional citations omitted). *See also Perez–Ruiz v. Crespo–Guillen,* 25 F.3d 40, 42 (1st Cir.1994). Therefore, Grant cannot base his § 1983 claim on an alleged violation of his due process rights.

 To avoid this bar to recovery, Grant asserts that his claim is premised on his alleged Fourth Amendment right to be free of malicious prosecution. (*See* Pl.'s Opp. at 20–22). However, while the First Circuit has left open the possibility that a § 1983 malicious prosecution claim may be actionable under the Fourth Amendment under some circumstances, *see Nieves v. McSweeney,* 241 F.3d at 54, those circumstances do not exist here. "For a public official to transgress the Fourth Amendment through the initiation and pursuit of criminal charges, the prosecution of those charges must at a bare minimum have occasioned a deprivation of liberty consistent with the concept of a seizure." *Id.* No such seizure was effectuated here.

 Grant was arrested without a warrant. Since a claim of malicious prosecution challenges a seizure made "pursuant to legal process," events taking place prior to the issuance of the criminal complaint are not considered. *Id.* (in light of warrantless arrest, appellants have "the task of showing some post-arraignment deprivation of liberty, caused by the application of legal process, that approximates a Fourth Amendment seizure"). *See also Calero–Colon v. Betancourt–Lebron,* 68 F.3d 1, 3 (1st Cir.1995) ("[t]he interest at stake in a malicious prosecution claim is the right to be free from deprivations of liberty interests *caused by unjustifiable criminal charges and procedures*") (emphasis added). However, after Grant was

booked at the police station, he was released. As a result, there was no "seizure" to support a Fourth Amendment violation.

In *Nieves v. McSweeney,* the arrestees asserted the same deprivations as Grant, and the court entered summary judgment on their § 1983 malicious prosecution claims. There, as here, after a warrantless arrest, "the appellants were released on their own recognizance; they suffered the stress and anxiety of knowing not only that serious criminal charges were pending against them, but also that their reputations had been sullied; they appeared before the criminal court a number of times in the pretrial period; and they endured the trial." 241 F.3d at 54–55. Nevertheless, in *Nieves,* as in the instant case, "these strictures, in the aggregate," are insufficient to "constitute a Fourth Amendment seizure sufficient to ground a section 1983 malicious prosecution claim[.]" *Id.* at 55. Therefore, summary judgment shall enter in favor of Hancock on Count II of the Complaint.

### 3. *Count III—Conspiracy*

In Count III, Grant alleges that there was a conspiracy "between Hancock and the (Non–Party) State" to deprive him of his constitutional rights in connection with commencing and continuing the assault and battery prosecutions against him in an effort to "extort" him into "waiving his property right to sue Hancock." (*See* Compl. at ¶ 165). A conspiracy claim must show "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong or injury upon another,' and 'an overt act that results in damages.'" *Earle v. Benoit,* 850 F.2d 836, 844 (1st Cir.1988) (internal cita-

tion omitted). Again, to sustain his § 1983 claim, Grant must prove state action and a deprivation of his constitutional rights as well. *Nieves v. McSweeney,* 241 F.3d at 53. For the reasons detailed herein, summary judgment shall be entered in favor of the defendants.

Although not clearly stated, it appears that Grant is contending that there was a conspiracy to deprive him of his Fourth and Fourteenth Amendment rights in connection with his criminal prosecutions. However, as detailed above in connection with Count II, even assuming that Grant can establish a claim of malicious prosecution, it does not rise to the level of a constitutional violation.

By bringing the District Attorney's Office into the conspiracy count (albeit as a "non-party"), Grant seems to be attempting to broaden his malicious prosecution claim to incorporate an argument that Hancock conspired with a state actor, to wit the District Attorney's Office, in wrongfully seeking to obtain a civil release in exchange for an agreement to drop the criminal charges. Although the argument is not clear, Grant seems to be claiming that the addition of the request for a release establishes that the state's prosecution of him was "arbitrary and capricious," and proves the absence of any legitimate state interest, since the state was willing to drop the charges. (*See* Pl.'s Opp. at 25–26). This argument fails, however, as a matter of law and fact.

As an initial matter, Grant does not claim that the District Attorney's Office acted improperly in initially pursuing the assault and battery case, nor could he. The prosecutor had a signed statement from Glancy which stated facts sufficient to establish a case for assault and battery. There is no evidence that the prosecutor had reason to believe that Glancy's statement was false. Therefore, the inevitable

conclusion is that the state actor in the prosecution, the District Attorney's Office, had probable cause to pursue the case, at least initially. *See Alexis v. McDonald's,* 67 F.3d at 351, and cases cited (police officer entitled to rely on eyewitness report in arresting plaintiff). This conclusion is buttressed by the fact that, according to Grant, it was not until November 1998, two months after the initiation of the criminal complaint, that the issue of Grant's potential suit against Hancock arose. Thus, there is no constitutional violation at least at the outset of the criminal action.

 Similarly unsupportable is Grant's premise that the District Attorney's Office acted improperly in pursuing the action. Again, Grant has not produced any evidence, nor has he claimed, that the District Attorney's Office was aware of any alleged perjury on the part of Glancy and O'Brien.[5] The first trial ended in a hung jury, evidencing that some jurors believed that there was sufficient evidence to convict. Thus, the DA was not required to drop the action.

The fact that the DA's office may have requested a release of civil claims from Grant does not compel a different result. The United States Supreme Court has held that a prosecutor may appropriately negotiate an agreement whereby criminal charges are dropped in exchange for a release of § 1983 claims against the city and municipal officials. As the Court held in *Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), upholding a "release-dismissal agreement" in

light of a claim that it was inherently coercive, "[i]n many cases a defendant's choice to enter into a release-dismissal agreement will reflect a highly rational judgment that the certain benefits of escaping criminal prosecution exceed the speculative benefits of prevailing in a civil action." *Id.* at 394, 107 S.Ct. 1187. As to the prosecutor's motivation, the Court refused to assume that a prosecutor would bring frivolous charges or dismiss meritorious charges. *Id.* at 396, 107 S.Ct. at 1193–94. Rather, the Court noted that a release of claims could serve the public interest of not having to devote time and resources to the defense of litigation. *Id.* at 395, 107 S.Ct. at 1187. Moreover, the Court recognized that prosecutors must make difficult decisions in deciding who and when to prosecute, and that judicial deference to such prosecutorial decisions is warranted. *Id.* at 396, 107 S.Ct. at 1194. Thus, "[i]n addition to assessing the strength and importance of a case, prosecutors also must consider other tangible and intangible factors, such as government enforcement priorities .... Finally, they also must decide how best to allocate the scarce resources of a criminal justice system that simply cannot accommodate the litigation of every serious criminal charge." *Id.* (citations omitted). Since the Supreme Court has found that such release-dismissal agreements are not *per se* improper, much less unconstitutional, the *offer* of such an agreement cannot possibly be construed as unconstitutional. Therefore, Grant cannot base his § 1983 claim on the alleged offer to drop the criminal complaint in exchange for a civil release.[6]

---

**5.** Obviously, to the extent that Hancock or its employees engaged in perjury, that can be addressed through the claim for malicious prosecution as discussed *infra.*

**6.** *Newton* does not seem to be limited to dismissals in exchange for releases of § 1983 claims. In any event, although Grant's case

is not a § 1983 action against municipal officers, as in *Newton,* Grant is in error when he argues that the State would have obtained no benefit from a release. For example, but without limitation, Grant asserts that Glancy was acting as an arm of the State, and the prosecutor may have been legitimately inter-

The defendants point out that the actions as alleged may constitute a violation of the ethical rules governing attorneys. It is not clear whether Grant is arguing that the offer constituted an ethical violation on the part of the prosecutor's office. In *Newton,* the Supreme Court did note that in certain situations release-dismissal agreements could be misused if, for example, they were used by prosecutors to trump up charges. *Id.* at 394, 107 S.Ct. at 1193. However, the Court concluded that such abuses could be addressed in the context of an ethical violation, but did not warrant the *per se* invalidation of the agreements. *See id.* at 395, n. 4, 107 S.Ct. at 1193, n. 4 (citing ABA Model Code of Professional Responsibility, Disciplinary Rule 7–105 (1980)). *See also* Mass. Supreme Judicial Court Rule, Canon 7, DR. 7–105(a) which provided at the relevant time that an attorney "shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter." This does not save Grant's claim as it is well established that the "Canons of Ethics and Disciplinary Rules provide standards of professional conduct of attorneys and not grounds for civil liability." *Sullivan v. Birmingham,* 11 Mass.App.Ct. 359, 369, 416 N.E.2d 528, 534 (1981) (citation omitted). "A violation of a canon of ethics or a disciplinary rule ... is not itself an actionable breach of duty to a client." *Fishman v. Brooks,* 396 Mass. 643, 649, 487 N.E.2d 1377, 1381 (1986). It certainly does not rise to the level of a constitutional violation. In sum, the fact that a release of civil claims may have been sought does not raise Grant's claims to the level of constitutional violations sufficient to state a claim under § 1983.[7]

As further grounds for his § 1983 claims, Grant also argues that somehow the criminal prosecution infringed on his right to travel. However, as detailed above Grant was never "seized" in connection with the prosecution of the cases against him. Moreover, even assuming a general constitutional "right to travel" (the source of which Grant has not identified), there is no evidence that Grant's right to travel was in any way impinged upon by the prosecutions.[8] Thus, this argument will not sustain a claim under § 1983.

ested in not putting Special Officers through the time and expense of civil litigation. Moreover, even though Grant did not name the District Attorney's Office in the present litigation, he did seek and take discovery from the prosecutor's office, and the office did have to address discovery motions. A release would have benefitted the District Attorney's Office, as well as Hancock, by not requiring it to devote time and energy to this litigation. In addition, the District Attorney's Office would have the same legitimate "tangible and intangible" considerations identified in *Newton* in deciding whether to continue with the prosecution. In sum, the fact that a release was sought does not raise a claim under § 1983.

7. For all of these reasons, even assuming that Hancock could be liable under the Hobbs Act, as Grant argues, there is no evidence that the District Attorney's Office, the state actor, conspired to violate the Hobbs Act by seeking the release.

8. The right conferred by the constitution is protection from undue restrictions on one's right *to* travel, not protection *from* travel. *See Saenz v. Roe,* 526 U.S. 489, 498–500, 119 S.Ct. 1518, 1524–25, 143 L.Ed.2d 689 (1999) ("right to travel" protects "the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State"). There is, notably, no fundamental right not to be compelled to appear for a criminal trial merely because the trial occurs in a state different from one's current state of residence.

■ Grant has alleged, but offered no evidence of, a violation of the Eighth Amendment. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted," and "was designed to protect those convicted of crimes." U.S. CONST. amend. VIII; *Ingraham v. Wright*, 430 U.S. 651, 664, 97 S.Ct. 1401, 1408–09, 51 L.Ed.2d 711 (1977). As Grant was acquitted, his § 1983 claims do not implicate the conditions of punishment or incarceration. The Eighth Amendment cannot form the constitutional basis of Grant's § 1983 claim against any of the defendants.

■ Finally, Grant argues, without citation, that his "ninth amendment right to privacy was infringed" by the prosecutions brought against him. (Pl.'s Opp. at 24–25). The Ninth Amendment states that the "enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people," but the Amendment "does not create substantive rights beyond those conferred by governing law." U.S. CONST. amend. IX; *Vega–Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 182 (1st Cir.1997) (finding that individual privacy claims in the workplace had no constitutional basis in Ninth Amendment). Thus, Grant's § 1983 claim "based on the Ninth Amendment holds no merit, since the Ninth Amendment does not grant any substantive rights." *Dewitt v. Wall*, 2001 WL 1136090, at *5, 2001 U.S. Dist. LEXIS 15768, at *15 (D.R.I. July 31, 2001). *See also Froehlich v. Wisconsin*, 196 F.3d 800, 801 (7th Cir. 1999) ("The Ninth Amendment is a rule of interpretation rather than a source of rights"). Therefore, the plaintiff cannot meet § 1983's requirement of proof of a constitutional deprivation by invoking the Ninth Amendment.

Since Grant has not established that there was a conspiracy to deprive him of his constitutional rights, summary judgment shall enter in favor of Hancock on Count III of the Complaint.

### C. *Civil Conspiracy*

■ In Count XII for "civil conspiracy," Grant claims that two conspiracies caused him injury: Glancy and O'Brien allegedly combined to beat him and to present perjured testimony at trial, and Hancock and the District Attorney's Office allegedly agreed to unlawfully offer to drop the pending criminal charges in exchange for a civil release of Hancock. Under Massachusetts law, two types of civil conspiracies exist. "There is precedent supporting a 'very limited cause of action in Massachusetts' for 'civil conspiracy' of a coercive type.... 'In order to state a claim of (this type of civil conspiracy), plaintiff must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently.' " *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir.1994) (quoting *Jurgens v. Abraham*, 616 F.Supp. 1381, 1386 (D.Mass.1985)). The second type of civil conspiracy is "akin to a theory of common law joint liability in tort." *Aetna Cas. Sur. Co.*, 43 F.3d at 1564. Because it is not clear upon which theory of conspiracy Grant relies, his claims will be analyzed under both. Under either analysis, however, Grant has failed to state a claim and the motion for summary judgment is allowed.

■ The first type, the "true conspiracy," has most frequently been applied to combinations of employers or employees working together in "concerted refusals to deal." *Mass. Laborers' Health & Welfare Fund v. Philip Morris*, 62 F.Supp.2d 236, 244 (D.Mass.1999) (citing *Fleming v. Dane*, 304 Mass. 46, 50, 22 N.E.2d 609, 611

(1939)). Outside of this context, a claim of civil conspiracy is "rare" and a "very limited" cause of action. *Id.* "The plaintiff must allege and prove that by 'mere force of numbers acting in unison' the defendants exercised 'some peculiar power of coercion of the plaintiff which any individual standing in a like relation to the plaintiff would not have had.'" *Id.* (quoting *Fleming v. Dane*, 304 Mass. at 50, 22 N.E.2d at 611). Evidence of joint activity, even tortious activity, is insufficient to prove a coercive conspiracy. *See Tennaro v. Ryder System, Inc.*, 832 F.Supp. 494, 499 (D.Mass.1993) and cases cited (summary judgment allowed on claim of civil conspiracy).

■ Under the stringent standard set by Massachusetts law for the independent tort of conspiracy, Grant's claim fails, even if he shows that the participants in each of the separate alleged conspiracies acted "in unison." Simply put, "[t]here was no force of numbers." *Fleming v. Dane*, 304 Mass. at 50, 22 N.E.2d at 611. Whether analyzing Grant's claims as two separate conspiracies, one involving Glancy and O'Brien, and the other involving the Assistant District Attorney and Hancock, or analyzing the claim as involving all four parties, there is nothing "which gives to their acts in combination any greater or different tortious quality than would be ascribed to the same acts if performed by separate individuals only." *Id.* at 50, 22 N.E.2d at 612.[9] Grant has failed to establish a "coercive conspiracy."

■ The second type of conspiracy is not an independent action, but rather involves "'concerted action,' whereby liability is imposed on one individual for the tort of another." *Kurker v. Hill*, 44 Mass. App.Ct. 184, 188, 689 N.E.2d 833, 836. "Under this theory, a defendant may be held liable for actions done by others pursuant to a common design or with the defendant's substantial assistance or encouragement." *Mass. Laborers' Health & Welfare Fund v. Philip Morris*, 62 F.Supp.2d at 244 (citations omitted). "Key to this cause of action is a defendant's substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan." *Kurker v. Hill*, 44 Mass.App.Ct. at 189, 689 N.E.2d at 837. Thus, plaintiff must establish "a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result.'" *Id.* (quoting *Stock v. Fife*, 13 Mass.App.Ct. 75, 82 n. 10, 430 N.E.2d 845, 849 n. 10 (1982)).

■ To show "concerted action" in the claims relating to the prosecutions and alleged extortion, Grant must present evidence creating a genuine issue of fact as to whether an agreement existed between Hancock and the District Attorney's Office to cause injury to Grant. *See Therrien v. Hamilton*, 849 F.Supp. 110, 115 (D.Mass. 1994). Because there is no evidence that anyone in the District Attorney's Office knew that it was engaged in an illegal purpose by prosecuting Grant without probable cause, as he alleges, his theory fails. As previously discussed, Grant has cited nothing in the record to support the conclusion that the Boston Police should have suspected Glancy's statement to be

---

9. Grant argues that the fact that the impact of Glancy's and O'Brien's testimony "in tandem [would be] far greater [than] if they had told different stories" (Pl.'s Opp. at 46) creates the basis of a conspiracy. That argument must fail as it does not establish that the alleged coercive power was as a result of the "force of numbers." Similarly, the fact that Hancock may have cooperated with the prosecutor does not create an overpowering situation based on numbers. Grant's scenarios are clearly not the "rare" type of "peculiar power of coercion" anticipated by Massachusetts courts.

false. Likewise, he provides no evidence that the prosecutor had any knowledge that the complaint that issued based on Glancy's statement was based on untruths, or that Glancy and O'Brien's testimony would be, or was, perjurious. Because a conspiracy requires an agreement to commit a wrongful act, none can exist where an alleged participant lacks knowledge that a wrongful act is being perpetrated. *See Kyte v. Philip Morris,* 408 Mass. 162, 167–68, 556 N.E.2d 1025, 1028 (1990) (no liability against manufacturer where manufacturer had no knowledge of retailers' sales of tobacco to minors). Finally, as detailed above, Grant has failed to establish anything wrongful on the part of the District Attorney's Office in connection with requesting a release of liability in exchange for a dismissal of the criminal prosecutions. For these reasons, the civil conspiracy claim based on the alleged conspiracy between Hancock and the District Attorney's Office will be dismissed.

■ Equally unavailing is Grant's claim that Glancy and O'Brien conspired to cause him physical harm in connection with the altercation of September 11, 1998. Tort claims addressing these acts have already been alleged against both Glancy and O'Brien. "Where the allegations of conspiracy add nothing to the underlying tort allegations, the courts have repeatedly held that 'the gist of such an action is not the conspiracy alleged, but the tort committed against the plaintiff.'" *Putman v. Adams Comm. Corp.,* Civ. A. No. 84–0355–S, 1987 WL 13262, at *9 (D.Mass. June 15, 1987) (citation omitted). Therefore, summary judgment shall be entered in favor of

the defendants on the claim of civil conspiracy.

### D. State Law Tort Claims and The Workers' Compensation Act

The parties have grouped a number of the state law claims together, and, for convenience, the court will address them in one section. Thus, Grant asserts the following state law claims arising out of his altercation with Glancy and O'Brien: assault (Count VI), battery (Count VII), negligent infliction of emotional distress (Count XIV) and false imprisonment (Count XV).[10] For the reasons detailed below, summary judgment shall be entered in favor of all defendants on these counts as they are barred by the exclusivity provisions of the Massachusetts Workers' Compensation Act, Mass. Gen. Laws ch. 152, § 24.

Grant also has asserted a claim of intentional infliction of emotional distress against all three defendants arising out of both the altercation as well as the decision to continue to prosecute him. (Count XIII). Summary judgment as to this count is allowed as to the altercation, but denied insofar as it relates to the prosecution-related events. Such post-termination events are not barred by the Workers' Compensation Act.

### 1. Claims Barred By The Workers' Compensation Act

■ The Workers' Compensation Act precludes common law actions for both negligence and intentional torts that arise "out of and in the course of employment."[11] *Doe v. Purity Supreme, Inc.,*

---

10. Grant does not challenge the motion for summary judgment insofar as it relates to the negligent infliction of emotional distress and false imprisonment claims.

11. Under the Workers' Compensation Act, employees may reserve a right of action pursuant to Mass. Gen. Laws ch. 152, § 24, so as to avoid the exclusivity bar. Grant has not alleged nor provided evidence that he made any such reservation of rights.

422 Mass. 563, 565, 664 N.E.2d 815, 818 (1996) (claims for negligence, assault and battery, false imprisonment, and negligent and intentional infliction of emotional distress barred by Act; summary judgment properly granted for defendant-employer). " 'An injury arises out of the employment if it arises out of the nature, conditions, obligations, or incidents of the employment; in other words, out of the employment looked at in any of its aspects.' " *Id.* at 566, 664 N.E.2d at 819 (quoting *Caswell's Case*, 305 Mass. 500, 502, 26 N.E.2d 328, 330, (1940)). The Act not only bars suits for negligence and intentional torts against an employer, but also against co-workers "if the fellow employee also was acting in the course of employment." *Anzalone v. Mass. Bay Transp. Auth.*, 403 Mass. 119, 124, 526 N.E.2d 246, 249 (1988), and cases cited (claim of intentional infliction of emotional distress against co-worker barred by the Workers' Compensation Act); *Mulford v. Mangano*, 418 Mass. 407, 410, 636 N.E.2d 272, 274–75 (1994) (if fellow employee acting in the course of his employment, fellow employee immune from liability under Workers' Compensation Act).

### Status of Glancy and O'Brien

Thus, the first issue to be decided is whether Glancy and O'Brien were acting in the course of their employment when they participated in the altercation with Grant. " '[C]onduct of an agent is within the scope of employment if it is of the kind he is employed to perform . . .; if it occurs substantially within the authorized time and space limits . . .; and if it is motivated, at least in part, by a purpose to serve the employer . . . .' " *Doe v. Purity Supreme*, 422 Mass. at 568, 664 N.E.2d at 820 (citations omitted). Courts must apply an "objective test which assesses what the employee did and other facts in order to determine whether he acted at least in part for a job-related purpose." *Mulford v. Mangano*, 418 Mass. at 412, 636 N.E.2d at 276. As Grant himself recognizes, Glancy and O'Brien "were acting within the scope of their employment with John Hancock" when they were dealing with Grant on September 11, 1998. (Pl.'s Opp. at 32). The undisputed evidence is that the security officers were escorting Grant at the direction of Hancock, and were supervising his departure as part of their responsibilities as security officers—they had no independent relationship with Grant. Glancy and O'Brien were engaged in the type of action that Hancock employed them to perform and, therefore, they are entitled to the protection of the Workers' Compensation Act. *See Doe v. Purity Supreme*, 422 Mass. at 568, 664 N.E.2d at 820.

The fact that Glancy and O'Brien may have used excessive force, and that the use of such force may not have been in Hancock's best interest, does not change the fact that the security guards were acting within the course of their employment. As the court held in *Boyle v. Boston Found., Inc.*, 788 F.Supp. 627, 631 (D.Mass.1992), dismissing a claim of intentional infliction of emotional distress as being barred by the Worker's Compensation Act, the fact that the fellow employees may have been acting illegally "will not automatically bring an intentional tort claim out of the class of those torts barred by the Worker's Compensation Act. The key remains whether the acts of the offending employer or agent were in the course of the employment relationship and purportedly in furtherance of the employer's interest." To hold otherwise would render meaningless the Act's grant of immunity for intentional torts. Thus, the record establishes that Glancy and O'Brien were acting within the course of their employment during their altercation with Grant, and were purporting to further their employer's interest

when the altercation occurred. *See O'Connell v. Chasdi,* 400 Mass. 686, 690 n. 5, 511 N.E.2d 349, 352 n. 5 (1987) (court acknowledges but does not reach "the argument that an intentional tort (e.g., assault and battery) by an employee (e.g., a security officer) against a coemployee might, in some circumstances, be so related to the employer's interests as to immunize the offending employee").

### Grant's Status as an Employee

The next issue which must be decided is whether Grant is to be considered an employee at the time of the altercation and, therefore, covered by the Worker's Compensation Act. The facts are undisputed. Grant's employment had been terminated. He had brought some of his belongings home and had promptly returned to the entrance specified by Hancock to meet with the security officers and be escorted to his cubicle to finish cleaning out his belongings. Under such circumstances, the Act controls.

██ "Generally, termination of employment extinguishes an employer's liability for an injury to an employee which occurs after his discharge," yet coverage has been extended under the Act "to an employee who, subsequent to discharge, was injured while leaving his employer's premises and winding up his affairs." *Larocque's Case,* 31 Mass.App.Ct. 657, 659, 582 N.E.2d 959, 960 (1991) (citing *Zygmuntowicz v. Am. Steel & Wire Co.,* 240 Mass. 421, 423–24, 134 N.E. 385, 387 (1922)) (other internal citations omitted). Moreover, as the Massachusetts Supreme Judicial Court stated with approval in *Larocque's Case,* "[o]ther jurisdictions have extended workers' compensation benefits to employees who sustain injuries while leaving or returning to their employers' premises to wind up their affairs within a reasonable time after termination .... The key to coverage in all these cases is that the post-termination activity is closely related to the employment, both in time and place." *Id.* (numerous citations omitted). Thus, in *Larocque's Case,* a fatal heart attack allegedly caused by a supervisor's phone call two weeks after termination which took place in the former employee's home was too attenuated to come under the purview of the Act. In *Zygmuntowicz,* however, a claim for assault and battery which arose out of a fracas between a fired employee and the employer's watchman while the employee was in the process of leaving work was found to be barred by the Act. 240 Mass. at 423–24, 134 N.E. at 387.

In the instant case, Grant's claims relating to the altercation are closely related to his employment in both time and place, as they occurred on the Hancock premises, at Grant's cubicle, within hours after Grant was told he was terminated, and as Grant collected the personal possessions he had stored at his workplace. Hancock's grant of a "license" for Grant to be on the property does not affect the "time and place" analysis under the Workers' Compensation Act.

Since Glancy and O'Brien's actions occurred in the course of their employment, and any injuries sustained by Grant occurred likewise in the context of his employment with Hancock, the exclusivity provision of the Workers' Compensation Act controls. For these reasons, summary judgment shall enter in favor of defendants on Grant's claims of assault (Count VI), battery (Count VII), negligent infliction of emotional distress (Count XIV), false imprisonment (Count XV), and intentional infliction of emotional distress to the extent that it relates to the altercation of September 11, 1998 (Count XIII).

### 2. Intentional Infliction of Emotional Distress

██ Part of Grant's claim for intentional infliction of emotional distress re-

lates to Morton's alleged involvement with the prosecution of Grant and the decision to continue to prosecute him. (*See* Pl.'s Opp. at 47–48; Compl. at ¶ 230). Such conduct is too removed in time and place from Grant's employment to be covered by the Workers' Compensation Act. *See Larocque's Case,* 31 Mass.App.Ct. at 659–60, 582 N.E.2d at 960–61. As Hancock has not raised any other grounds for the dismissal of this count, the motion for summary judgment as to the claim of intentional infliction of emotional distress based on post-altercation events is denied.

 The court does recognize the very high standard that the plaintiff will have to satisfy to prevail on this claim at trial. The plaintiff will have to show "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct ...; (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community' ...; (3) that the actions of the defendant were the cause of the plaintiff's distress ...; and (4) that the emotional distress sustained by the plaintiff was 'severe' and of a nature 'that no reasonable man could be expected to endure it.'" *Caputo v. Boston Edison Co.,* 924 F.2d 11, 14 (1st Cir.1991) (quoting *Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315 (1976)).[12] As the court held in *Foley v. Polaroid,* 400 Mass. 82, 508 N.E.2d 72 (1987):

> [L]iability cannot be predicated upon "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," nor even is it enough "that

the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort"; rather, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46, comment d (1965).

*Id.* at 99, 508 N.E.2d at 82.

 The facts relating to the post-altercation events are in dispute. It will be for the jury to determine whether Grant's version of events, including his assertion that Glancy and O'Brien perjured themselves repeatedly, is true. It will also be for the jury to decide whether the defendants' conduct rises to the level of intentional infliction of emotional distress.

### E. *Negligence*

The complaint appears to assert a claim of negligence against Hancock based on the altercation with Glancy and O'Brien. (*See* Compl. at ¶¶ 211–212).[13] However, Grant has withdrawn such a claim, and instead argues that Hancock "knew or should have known" that Morton was acting illegally in connection with the prosecution of Grant. (*See* Pl.'s Opp. at 41). No case citations are included in this one paragraph argument.

---

**12.** An employer may be held vicariously liable for "emotional distress intentionally inflicted by one employee on another." *Green v. Wyman–Gordon Co.,* 422 Mass. 551, 558–559, 664 N.E.2d 808, 813 (1996), and case cited.

**13.** Given the language of the complaint, Hancock appropriately argued in its motion for summary judgment that the negligence claim was barred by the Workers' Compensation Act.

For the reasons detailed above, to the extent that the negligence count (Count IX) is based on the altercation, it is barred by the Workers' Compensation Act. To the extent that it is based on the negligent supervision of Morton, Hancock is still entitled to summary judgment on this count. Grant has not alleged sufficient facts to satisfy the elements of a negligent supervision claim.

In order to prevail on a claim of negligent supervision, Grant must demonstrate that (1) there was a duty or standard of care owed to him by Hancock; (2) Hancock's conduct constituted a breach of such duty or violation of such standard of care; (3) the employees' conduct was the proximate cause of his harm; and (4) he suffered actual harm. *See Moylan v. Stop & Shop Cos., Inc.,* No. 99–2140, 2001 WL 262661, at *2 (Mass.Super. March 14, 2001) (citing *Bennett v. Eagle Brook Country Store, Inc.,* 408 Mass. 355, 358, 557 N.E.2d 1166, 1168 (1990)). Assuming a duty to supervise in this instance, Grant has offered no evidence tending to show a causal relationship between Hancock's acts or omissions in supervising Morton (or Glancy and O'Brien) and Grant's alleged injuries. *See Sugrue v. Union Cafe, Inc.,* 49 Mass.App.Ct. 1117, 1117, 735 N.E.2d 1272, 1272 (2000) (summary judgment allowed on negligent supervision claim where causation not shown); *Vicarelli v. Business International, Inc.,* 973 F.Supp. 241, 246–47 (D.Mass.1997) (motion to dismiss negligent supervision claim allowed absent evidence employer knew or should have known of employee's misconduct). As no facts establish the existence of a genuine issue of material fact on the question of causation, summary judgment on the claim of negligence is appropriate.

### F. *Malicious Prosecution*

In Count V of his complaint, Grant has asserted a state law claim for malicious prosecution against all the defendants. The fact that Grant has failed to state a claim of malicious prosecution sufficient to constitute a violation of constitutional rights does not mean that he has not alleged sufficient facts to support a state-law claim for malicious prosecution. *See Britton v. Maloney,* 196 F.3d 24, 29, 32 (1st Cir.1999) (where criminal prosecution did not impose any restrictions on liberty other than a future obligation to appear in court, there was no Fourth Amendment "seizure" and therefore no basis for § 1983 malicious prosecution claim; however, jury finding on state law malicious prosecution claim upheld). There are material facts in dispute relating to Grant's claim of malicious prosecution, and Hancock's motion for summary judgment on Count V is denied.

> Central to the tort of malicious prosecution is that the actor to be held liable must have made perverse use of the litigation process by instigating criminal proceedings without probable cause and primarily for a purpose other than bringing the targeted person to justice.... Although distinct from the tort of abuse of process,... there is in malicious prosecution the common ingredient of an improper purpose, i.e., using court proceedings primarily to gain a private advantage, because of hostility and ill will, and without belief by the accuser in the guilt of the accused. Restatement (Second) of Torts, § 668 comments c-g.

*Conway v. Smerling,* 37 Mass.App.Ct. 1, 3, 635 N.E.2d 268, 271 (1994) (internal citations omitted).

> If a citizen registers with the police an apprehension that a crime has been committed and leaves the matter to the judgment and responsibility of the public officers, that citizen, though having started the chain of events that led to

legal process, cannot be charged with malicious prosecution.... If, on the other hand, the citizen presses the police to apply for a complaint, an action for malicious prosecution lies against the importuning citizen (provided, of course, that all other elements of the tort are present).

*Id.* at 4–5, 635 N.E.2d at 271–72 (internal citations omitted).

 Here, Grant contends that 'Glancy and O'Brien fabricated the story of the events leading to his arrest to cover up their loss of control and use of excessive force. He further contends that they continued to perjure themselves at his two trials both to protect themselves and/or for Hancock's benefit. Hancock, according to Grant, is liable either as a direct participant or on the basis of respondeat superior. These assertions, which are premised on Grant's own eye-witness/participant version of events, raise a dispute as to material facts compelling the denial of the defendants' motion for summary judgment.

The defendants argue that they could not have been using the court proceedings for private gain because the only private advantage allegedly being sought was a release of civil claims, and most of those claims are barred by the Workers' Compensation Act. (*See* Defs.' Mem. at 15). Hancock further argues that seeking a release was not an improper purpose—rather, if Hancock made the offer to drop the charges (which it denies), it was "simply giving Grant a chance to avoid what it thought was a legitimate criminal prosecution." (Defs.' Mem. at 16). However, these are issues which must be resolved by a jury.

Hancock's argument ignores the fact that if Glancy and O'Brien were acting merely to save their jobs, this could be a sufficient motive to support a finding of malicious prosecution. There is no need to find that they were attempting to get a release. Moreover, as detailed above, not all of Grant's claims are barred by the Workers' Compensation Act. Furthermore, a jury could find that Hancock was not simply offering Grant a graceful way out, but rather was attempting to get itself out of a predicament caused by overly zealous security officers. Hancock has proffered a hyper-technical analysis of the record to support its claim for summary judgment. However, the material facts are in dispute, and the motion for summary judgment as to Count V is denied.

### G. *Grant's "Reliance–Based" Claims*

Grant has raised two claims challenging the means by which Hancock allegedly induced him to join the company. Thus, Count X (promissory estoppel) and Count XI (fraud, deceit, misrepresentation) against Hancock assert that Hancock improperly induced Grant to forego other opportunities and accept employment by misrepresenting the responsibilities of the job as not including substantial amounts of PTS work.

Hancock contends that, as a matter of law, Grant did not rely on these alleged representations to his detriment, since he did not have any other job offers, and any reliance was not reasonable as a matter of law since Hancock was seeking a candidate with PTS experience and his PTS experience was the focus of Grant's interviews. However, the existence and reasonableness of Grant's reliance is a matter for the jury, and Hancock's motion for summary judgment on Counts X and XI is denied.

 To prevail on a motion for summary judgment on the fraud claim, Hancock must establish "that no jury could reasonably find" that the elements of fraud have been established. *Biggins v. Hazen Paper Co.*, 953 F.2d 1405, 1419 (1st Cir.1992) (citing *Turner v. Johnson &*

*Johnson,* 809 F.2d 90, 95 (1st Cir.1986)). "To sustain a claim of misrepresentation, a plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment." *Zimmerman v. Kent,* 31 Mass.App.Ct. 72, 77, 575 N.E.2d 70, 74 (1991), and cases cited. Similarly, promissory estoppel "consists simply of a promise that becomes enforceable because of the promisee's reasonable and detrimental reliance." *Rooney v. Paul D. Osborne Desk Co., Inc.,* 38 Mass.App.Ct. 82, 83, 645 N.E.2d 50, 51 (1995), and cases cited. *See also Frederick v. ConAgra, Inc.,* 713 F.Supp. 41, 45 (D.Mass.1989). Thus, the plaintiff must establish detrimental and reasonable reliance to prevail on both claims.

▪▪ There are sufficient facts establishing Grant's detrimental reliance to withstand the motion for summary judgment. The evidence is, without limitation, that he was engaged in a job search, stopped his job search and moved to take a position with Hancock based on the representations about his job responsibilities. There is no requirement "as a matter of law that an employee offer proof of missed employment opportunities in a fraud claim against an employer whose very purpose was to secure the employee's forbearance from seeking alternative employment." *Biggins v. Hazen Paper Co.,* 953 F.2d at 1421. Because it is for the jury to decide whether Grant can prove detrimental reliance, his proof of the element of detrimental reliance does not fail as a matter of law. *Id.*

▪▪ "Whether reliance is reasonable is ordinarily a question of fact for a jury. However, if, on the facts alleged ... no reasonable jury could find that the plaintiff's reliance was reasonable, the defendants are entitled to judgment as a matter of law." *Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.,* 62 F.Supp.2d at 242, and cases cited. Grant testified that he relied on misrepresentations that he "wouldn't be doing a lot of PTS," that he "wouldn't be responsible for the PTS models," that he "wouldn't be working extensive overtime," and that "PTS was going to be modeled by Ernst & Young," among other things. (*See, e.g.,* DF App. at 104, 110, 112). Thus, Grant contends that he was assured that his job "would be to utilize the [Ernst & Young] PTS output, given [his] PTS expertise, and that [he] would not be doing the actual PTS modeling." (PF App. at Ex. 3, ¶ 10). Such statements were not so blatantly inconsistent with the job description as to require Grant to have demanded written assurances, as Hancock now argues.[14] *See Mass. Laborers',* 62 F.Supp.2d at 243, and cases cited ("Reliance cannot be deemed reasonable when the alleged misrepresentation is 'preposterous or palpably false,'" court recognizes that *"[e]xplicit conflict engenders doubt* ....") (citations omitted, emphasis added). This is simply not a case where the alleged oral misrepresentations were "completely at odds" with other information provided. *See and compare Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 804–05 (1st Cir.1987). The reasonableness of Grant's reliance (if any) is for the jury to decide.

For these reasons, Hancock's motion for summary judgment as to Counts X and XI is denied.

---

14. For example, the job description notes that while "significant PTS experience" is a requirement, "good PTS is OK." In fact, the job description clearly called for a broad range of experience. (*See* DF App. at 160–61).

## H. *Massachusetts Civil Rights Act*

In Count VIII, Grant asserts that all the defendants are liable under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11H and I,[15] for interfering with his secured rights under the laws of the Constitution of the United States and the Commonwealth of Massachusetts through threats, intimidation and coercion. (Compl. at ¶ 209). Specifically, Grant contends that the defendants violated his "secured rights under the Fourth, Fifth, Eighth, Ninth and Fourteenth Amendment to the United States Constitution, and [his] secured right to seek legal redress under the Massachusetts Declaration of Rights." (*Id.*) For the reasons detailed herein, the motion for summary judgment is denied insofar as Grant's claim relates to the altercation with Glancy and O'Brien, and allowed insofar as the claim is based on his criminal prosecutions.

█ To establish a claim under the MCRA, Grant must prove that (1) his "exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 395, 668 N.E.2d 333, 337 (1996) (citation omitted). Thus, the Massachusetts "Legislature intended to provide a remedy under Mass. Gen. Laws ch. 12, § 11I, coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not. The language requiring interference 'by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion ...' is

addressed to this private action." *Batchelder v. Allied Stores Corp.*, 393 Mass. at 822–23, 473 N.E.2d at 1131. Moreover, "by the Civil Rights Act, 'the Legislature did not intend to create a vast constitutional [and statutory] tort'" and "the insertion by the Legislature of the requirement of threats, intimidation or coercion was specifically intended to limit liability under the Act." *Freeman v. Planning Bd. of W. Boylston*, 419 Mass. 548, 565–66, 646 N.E.2d 139, 149, *cert. denied*, 516 U.S. 931, 116 S.Ct. 337, 133 L.Ed.2d 235 (1995).

█ Grant has stated a claim against all the defendants arising out of the physical altercation on September 11, 1998. There is no requirement of state action, so the status of Glancy and O'Brien as state actors is irrelevant. Under the MCRA, unlike its federal counterpart, corporations may be vicariously liable "for civil rights violations committed by their agents acting in the scope of their employment." *Sarvis v. Boston Safe Deposit & Trust Co.*, 47 Mass.App.Ct. 86, 97, 711 N.E.2d 911, 921 (1999). Therefore, all the defendants, Glancy, O'Brien and Hancock, may be liable under the MRCA.

█ Arranging for the arrest of Glancy may be sufficient to satisfy the requirement of threats, intimidation or coercion. *See id.* at 92–93, 711 N.E.2d at 918. Even clearer is the fact that the jury may find that the use of excessive force, as well as the physical restraint placed on Grant at various times by Glancy and/or O'Brien, constitute a violation of Grant's constitutional rights under the Fourth and/or Fourteenth Amendments, and such conduct may constitute coercion and/or intimidation sufficient to sustain a claim under the MCRA. *See Davis v. Rennie*, 264 F.3d

---

**15.** Mass. Gen. Laws ch. 12, § 11I provides for a private cause of action for violations of § 11H. *See Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 820 n. 2, 473 N.E.2d 1128, 1130 n. 2 (1985).

86, 110–12 (1st Cir.2001) (use of excessive force by a mental health worker, and the beating and restraining of the patient by others satisfies the requirements of intimidation and coercion under the MCRA). For these reasons, the motion for summary judgment insofar as it relates to the altercation between Grant, Glancy and O'Brien is denied.

 The issue relating to Grant's malicious prosecution claim as giving rise to a claim under the MCRA presents more difficult issues. Hancock argues that a threat of physical harm is needed to sustain a claim under the MCRA, and that the absence of such a physical component to Grant's claim mandates the entry of summary judgment. Since two recent decisions have included an extensive analysis of this issue, the discussion here will be abbreviated. The bottom line is that there is a long history "of shifting Massachusetts law interpreting the scope of the 'threats, intimidation, or coercion' requirement. It is not clear whether economic coercion meets the requirement, or whether Massachusetts law requires a physical confrontation." *Carvalho v. Town of Westport,* 140 F.Supp.2d 95, 100 (D.Mass.2001).

In *Carvalho,* Judge Young reviewed the history of cases addressing the definition of "threats, intimidation, or coercion" under the MCRA and concluded that a physical confrontation was not always needed. Therefore, a town's threat to discipline a police officer for exercising his First Amendment right to speak about matters of public concern, and the officer's eventual demotion in retaliation for his public statements, stated a claim under the MCRA. *Id.* at 101. In reaching this conclusion, Judge Young noted that *Carvalho* "fits neatly into the limited exception" to the physical confrontation requirement established by *Redgrave v. Boston Symphony Orchestra, Inc.,* 399 Mass. 93, 502

N.E.2d 1375 (1987), because *Carvalho,* like *Redgrave,* "involves coercion through threats of breach of contract, rather than general economic coercion ...." 140 F.Supp.2d at 102, n. 4.

Judge Young addressed the recent decision of Justice Ralph Gants, a justice of the Massachusetts Superior Court, in *Buster v. George W. Moore, Inc.,* No. 97–637–F, 2000 WL 576363, at *19 (Mass.Super. April 28, 2000), who "concluded that an actual or potential physical confrontation accompanied by threats of harm is an essential element of the Act" and therefore, after a trial, ruled that threats of economic coercion did not state a claim under the MCRA. *See* 140 F.Supp.2d at 102. In *Buster,* the plaintiffs contended that the defendants purchased a promissory note executed by the plaintiffs and foreclosed on the property securing the note in order "to pressure the plaintiffs into dismissing legal challenges they had made to the defendants' construction of a shopping center on nearby property." 2000 WL 576363, at *1. Judge Gants concluded that "[e]conomic coercion, standing alone, is not enough" to establish a claim under the Act. "Since the evidence in this case proves that the defendants did nothing more than place economic pressure on the defendants to withdraw their appeals and this is insufficient as a matter of law to establish a violation of the Act, the plaintiffs cannot prevail on this claim." *Id.* at *22. Thus, as Judge Young noted, *Buster* addressed "the broader question of whether economic coercion constitutes 'threats, intimidation, or coercion' under the Act" and, unlike *Carvalho,* did "not fit under the breach of contract exception established in *Redgrave.*" 140 F.Supp.2d at 102, n. 4

Factually, the present case most closely resembles *Buster* in that the claimed harm is being unlawfully prosecuted in order to compel the plaintiff to give up some claims.

Like *Buster*, the present case does not fall neatly within the "breach of contract exception" found in the *Redgrave* case, and the absence of an actual or threatened physical confrontation in connection with the prosecution of the criminal cases against Grant[16] warrants the entry of summary judgment in favor of the defendants.

▌ Grant's MCRA claim relating to the criminal prosecutions must fail, however, for a more fundamental reason. As detailed above, Grant has not successfully alleged a violation of his (state or) federal constitutional rights so as to support a violation of the MCRA. The fact that Grant might have been subject to a malicious prosecution does not rise to the level of a civil rights violation under the MCRA. Therefore, summary judgment shall be entered in favor of the defendants to the extent that Count VIII seeks to assert a claim under the MCRA relating to his criminal prosecutions.

### IV. *CONCLUSION*

For the reasons detailed herein, the defendants' motion for summary judgment is ALLOWED IN PART and DENIED IN PART. As to the specific counts of the Complaint, the court rules as follows:

Count I Motion for summary judgment DENIED.

Count II Motion for summary judgment ALLOWED.

Count III Motion for summary judgment ALLOWED.

Count IV Previously dismissed.

Count V Motion for summary judgment DENIED.

Count VI Motion for summary judgment ALLOWED.

Count VII Motion for summary judgment ALLOWED.

Count VIII Motion for summary judgment DENIED insofar as the count relates to the altercation of September 11, 1998, ALLOWED to the extent that the count relates to the criminal prosecutions which followed.

Count IX Motion for summary judgment ALLOWED.

Count X Motion for summary judgment DENIED.

Count XI Motion for summary judgment DENIED.

Count XII Motion for summary judgment ALLOWED.

Count XIII Motion for summary judgment ALLOWED insofar as it relates to the altercation of September 11, 1998, DENIED to the extent that the count relates to the criminal prosecutions which followed.

Count XIV Motion for summary judgment ALLOWED.

Count XV Motion for summary judgment ALLOWED.

---

**16.** Grant does not contend that the risk (or fear) of physical harm which arose in connection with the altercation with Glancy and O'Brien carried over into the events surrounding the criminal prosecutions.