Arthur J. THERRIEN, Plaintiff,

v.

William A. HAMILTON, Defendant.

Civ. A. No. 92–30046–MAP.

United States District Court,
D. Massachusetts.

April 19, 1994.

Kevin B. Coyle, Coyle, Dunbar & Geoffrion, Springfield, MA, for plaintiff.

Eugene J. Mulcahy, Brooks, Mulcahy & Sanborn, Springfield, MA, for defendant.

### MEMORANDUM REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]

(Docket No. 18)

PONSOR, District Judge.

### I. INTRODUCTION.

Plaintiff Arthur Therrien has been a police officer in the City of Holyoke since 1974, and has been the outspoken and sometimes controversial president of the local police officer's union since 1977.

Defendant William Hamilton became Mayor of Holyoke in early July of 1991. Less than two weeks later, Assistant City Solicitor Warren Johnson allegedly asked two police captains to notify him if Therrien's conduct was in any way substandard, in order that Therrien might then be terminated. Mayor Hamilton's name was allegedly mentioned by Johnson as the person behind the move to terminate Therrien.

Therrien brought this suit initially in state court, alleging that the mayor intended to and did in fact infringe his right to petition the government for redress of grievances and to speak freely. In Counts I and III, Therrien claims violation of 42 U.S.C. § 1983 and Mass.Gen.Laws ch. 12, § 11I (the Massachusetts Civil Rights Act), respectively. In Counts II and IV, plaintiff alleges that the mayor participated in a conspiracy to deprive him of his right to speak freely and to petition the government for redress of grievances in violation of 42 U.S.C. § 1985(3) and as part of a common law civil conspiracy. Count V claims that the mayor's conduct constituted an intentional infliction of emotional distress. Plaintiff seeks injunctive relief and compensatory and punitive damages.

Defendant removed the case to this court and now seeks summary judgment on all counts. For the reasons set forth below,

---

1. Oral argument was originally heard by me as a magistrate judge with a view to rendering a report and recommendation to the district court. Due to my intervening change in status, this memo will constitute the final ruling on the motion.

defendant's motion will be allowed on all counts.

## II. FACTUAL BACKGROUND.

The facts are viewed in the light most favorable to the plaintiff. Arthur Therrien began as a police officer in the City of Holyoke in 1974. Since 1977, he has served as president of Local 388, International Brotherhood of Police Officers, representing all officers of the Holyoke Police Department in collective bargaining negotiations with the City.

In this role, Therrien has been highly outspoken on matters relating to the health and welfare of the officers he represents. He has often criticized the policies of the police department and the various mayors of Holyoke. Therrien is a public figure in the Holyoke community. He has commanded local media attention both for his union activities and as a result of civilian grievances against him for excessive use of force. Therrien has been cleared of all charges for such grievances by internal investigations.

Defendant, William A. Hamilton, became Mayor of Holyoke on July 8, 1991 after winning a special election. At that time, two major issues in Holyoke politics caused tension between the police officer's union and the city administration. The first was the poor condition of the police station and the second was the presence of non-union police walking foot-patrols in the streets of downtown Holyoke.

The police station's condition was poor because the roof leaked badly; this resulted in a heavy build-up of mold and mildew, which in turn seemed to cause respiratory problems for some police officers. Therrien, as union president, had formally grieved this issue many times, and during the week of June 3, 1991 obtained a court order for the city to make a "good faith effort" to fix the roof. A month later, the new city administration did not commence immediate repairs on the police station, but rather sought to relocate the station to an alternate site. Therrien, representing the union, repeatedly threatened in public to ask the Hampden County Superior Court to hold the City in contempt. His public commentary is recorded in Appendix

A of plaintiff's Memorandum Opposing Summary Judgment (Affidavit of Therrien with copies of Newspaper Articles).

The union also opposed the presence of non-union foot police walking beats in downtown Holyoke, since their presence allegedly violated the officers' contract with the City. Mayor Hamilton agreed to detail union police officers to foot patrol, even though it meant fewer police in vehicles. Hamilton and Chief of Police Robert Wagner both stated publicly that they believed the decreased number of police in cars did not threaten the safety of the citizens. Therrien disagreed, and his numerous public comments on this issue also appeared in newspaper articles. See, Appendix A of plaintiff's Memorandum Opposing Summary Judgment. In one interview, Therrien was quoted as calling Mayor Hamilton's policy "stupid" and saying that the mayor had "no concept of police operations" and should not interfere with the department's activities.

This litigation arose because, on or about July 17, 1991, Therrien was allegedly the topic of a conversation between Assistant City Solicitor Warren "Jerry" Johnson and police Captains Stephen Donoghue and Russell Paquette. Johnson often met with Paquette and Donoghue, as the three all represented the City when arbitrating grievances filed by the police officer's union. Similarly, in his role as the City's collective bargaining agent, Johnson had for many years known and dealt with Union President Therrien.

Johnson stated in his affidavit that he was aware of past incidents involving Therrien for which he felt Therrien could have been, but was not, disciplined. The foremost example was a department "sick-out" allegedly organized by Therrien. The record shows that Therrien's relationship with Donoghue, Paquette, and Johnson has at times been acrimonious.

The July 17 conversation had three parts: first, Johnson spoke with Paquette; next, Donoghue arrived and Johnson brought him up to date on the topic of the conversation and finished speaking with Paquette, who left. Finally, Johnson spoke with Donoghue. The details of the second part of the conver-

sation (the exact words Johnson used to bring Donoghue up to date) are not part of the record.

In part one, Johnson spoke with Captain Paquette. Paquette alleged that Johnson stated that "the mayor wants to fire Therrien" and that Paquette should contact Johnson if Therrien "slips up" or did anything "worthy of getting fired." Deposition of Paquette at 17. Paquette did not question Johnson at all regarding whether he had actually talked to the mayor. *Id.* at 16. Johnson later asked Paquette for a police management book they had discussed previously in reference to Therrien, which recommended that an adverse inference be drawn about officers who were repeatedly the target of unrelated civilian complaints, even if these complaints were not proven. After July 17, 1991, Paquette heard nothing further indicating a mayoral desire to fire Therrien. He never spoke with the mayor. *Id.* at 19. Johnson denies that Mayor Hamilton ordered or was aware of this conversation, and Hamilton denies any awareness of this conversation.

In the third part of the July 17, 1991 conversation, Johnson spoke with Captain Donoghue. Donoghue averred that Johnson stated that Hamilton wanted to "get rid of [Therrien], the first chance he gets he is going to fire him." Deposition of Donoghue at 10. Donoghue asked whether the mayor had told Johnson this, and Johnson allegedly stated that he (Johnson) "got it from [Chief of Police] Wagner." *Id.* at 10, 11. Johnson has denied ever mentioning Wagner in the conversations with either Paquette or Donoghue, and denied stating that information on Therrien was being obtained at the request or on behalf of Hamilton. Affidavit of Johnson at ¶ 5. Donoghue noted that this conversation with Johnson stood out from the many conversations he had previously had with Johnson about Therrien, all of which had involved a specific allegation of misconduct. *Id.* at 18. This conversation was unique because Therrien and his job were the subject, but there had been no recent allegation of misconduct.

In their depositions, Paquette and Donoghue have stated that they interpreted John-

son's remarks on July 17 to mean that a plot was afoot by the City to fire Therrien at the first opportunity, and that Johnson was soliciting their assistance in seeking a pretext for the mayor to do so. The captains informed Therrien of this alleged plot the same day, and Paquette informed Johnson that he would not participate in any "witch-hunts" against Therrien. Johnson has denied engaging in any "witch-hunts" against plaintiff and denied seeking knowledge of any information on Therrien other than information pertaining to "serious matters such as the numerous complaints against Art Therrien for police brutality." Affidavit of Johnson at ¶ 4. Johnson has maintained that he stated or implied only that the new mayor would not be afraid to fire Therrien *if* there was good reason to do so.

Therrien, upon learning of this conversation from Paquette and Donoghue, immediately contacted representatives of the media and publicly accused Hamilton of attempting to terminate his employment because he, Therrien, was so outspokenly critical of the mayor and of city officials. Therrien pointed out that acrimony existed between the various mayors and him for some time, but that there was never evidence of an attempt to fire him before Hamilton took office. Therrien now argues that the mayor was trying to silence his criticisms by threatening to fire him, and that the local press would pay no attention to his opinions if he was no longer the union president.

Hamilton, the sole defendant in this case, has moved for summary judgment on the ground that the facts, even viewed in the light most favorable to Therrien, will not support a claim against him on any theory.

### III. SUMMARY JUDGMENT STANDARD.

■ At summary judgment, this court must view the record in the "light most hospitable to the party opposing summary judgment and indulge all reasonable inferences favorable to him." *Buenrostro v. Collazo,* 973 F.2d 39, 41 (1st Cir.1992). Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essen-

tial to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). It is of particular significance to this case that the First Circuit has stated that "summary judgment may be appropriate if the non-moving party rests [its case] merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). *See also, Rossy v. Roche Products, Inc.*, 880 F.2d 621, 624 (1st Cir.1989); *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 109–110 (1st Cir.1988).

## IV. DISCUSSION.

A. *Civil Rights Claims, 42 U.S.C. § 1983 and MCRA*

1. *42 U.S.C. § 1983*

To prevail on his § 1983 claim, plaintiff must show that someone, acting under the color of law, statute, or ordinance, deprived him of a right, privilege, or immunity secured by the constitution. Therrien claims that due to the mayor's alleged attempt to terminate him, he was deprived of his First Amendment rights to speak freely and to petition the government for redress of grievances.

■ The court will assume for the purpose of summary judgment that plaintiff's speech was protected. *See Connick v. Myers*, 461 U.S. 138, 147–148, 103 S.Ct. 1684, 1690–1691, 75 L.Ed.2d 708 (1983); *O'Connor v. Steeves*, 994 F.2d 905, 912 (1st Cir.1993). The central inquiry is whether there was, in fact, a *deprivation* of plaintiff's First Amendment rights, as required by 42 U.S.C. § 1983. No evidence of such a deprivation can be found.

Plaintiff appears to assert two grounds to support the "deprivation" argument. The first is that defendant tried to fire him with the purpose of chilling his First Amendment rights. Plaintiff asserts that *if* he had been discharged from the police department, the local media would not longer publicize his opinions, since he would no longer be "newsworthy."

This claim is without merit. "Where a chilling effect is speculative, indirect, or too remote, finding an abridgment of First Amendment rights is unfounded." *Sullivan v. Carrick*, 888 F.2d 1, 4 (1st Cir.1989) (citing *United States v. Harriss*, 347 U.S. 612, 626, 74 S.Ct. 808, 816, 98 L.Ed. 989 (1954)). Where no evidence exists of an actual deprivation of rights, speculation about possible consequences of a supposedly possible termination cannot be reasonably termed a "deprivation." The fact is that plaintiff has not to this day been terminated and any suppositions about what might happen to his First Amendment rights if he had been or were can only be imagined. Plaintiff's first ground for claiming a deprivation of First Amendment rights fails.

■ Second, plaintiff asserts that he was deprived of First Amendment rights because the news of the July 17, 1991 conversation between Johnson, Paquette, and Donoghue, "chilled" his exercise of his rights to speak freely and to petition the government for redress of grievances. This inhibition arose, plaintiff argues, even without a termination. This claim also fails.

Even viewing the facts in the light most favorable to plaintiff, there is simply no evidence of any "chill" of Therrien's free speech rights. On the contrary, the evidence of record clearly documents Therrien's free speech activities critical of the mayor *after* Therrien had news of the alleged Johnson–Paquette–Donoghue conversation. The conversation is supposed to have occurred on July 17, 1991, and Therrien learned of it that same day. Affidavit of Therrien, ¶¶ 12, 13. But on July 22, 1991, five days later, Therrien is quoted in the Holyoke *Transcript–Telegram* newspaper saying, in reference to Hamilton's actions regarding the non-union police foot patrol issue: "That's stupid," and "[Hamilton's] wrong ... He has no concept of police operations. That's why he's got to stay out of it." Plaintiff's Memorandum Opposing Summary Judgment, Appendix A (Affidavit of Therrien with Copies of Newspaper Articles).

■ "To show a First Amendment violation in this context, [the plaintiff] must show

that his speech was *in fact* chilled or intimidated[.]" *Sullivan, supra* at 4 (emphasis added). Conclusory allegations cannot be offered as support for the non-moving party's case in a motion for summary judgment. *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

■ Thus, even when the evidence is viewed in the light most favorable to plaintiff, there is no showing of either a potential or actual deprivation of First Amendment rights. Therrien continues to be an outspoken advocate of causes he believes in, and continues to bargain with fervor on behalf of the union. Plaintiff's mere allegation that he was harmed does not satisfy the causation requirement of a § 1983 action. *Sullivan, supra* at 4 (citing *Gordon v. Warren Consol. Bd. of Educ.,* 706 F.2d 778, 780 (6th Cir. 1983)); *accord Laird v. Tatum,* 408 U.S. 1, 13, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1972).

### 2. *Massachusetts Civil Rights Act*

■ The Massachusetts Civil Rights Act, Mass.Gen.Laws ch. 12, § 11 I, and 42 U.S.C. § 1983 are parallel statutes. *Jones v. City of Boston,* 738 F.Supp. 604, 606 (D.Mass.1990) (citing *Batchelder v. Allied Stores Corp.,* 393 Mass. 819, 822–823, 473 N.E.2d 1128 (1985)). Thus, the analysis for MCRA is similar to § 1983 analysis. "A person states a claim under [§ 11I] upon showing (1) 'threats, intimidation or coercion' that (2) lead to violation of a federal or Commonwealth constitutional right or statutory provision." *Elwood v. Pina,* 815 F.2d 173, 177 (1st Cir.1987) (citing *Batchelder v. Allied Stores Corp., supra* ). Like § 1983, MCRA requires an actual deprivation of constitutional rights. *Elwood* at 177–178 (stating that deprivation is an essential element of a MCRA claim); *Marsman v. Western Elec. Co.* 719 F.Supp. 1128, 1138–1139 (D.Mass. 1988). The issue of whether the mayor's alleged conduct amounted to "threats, intimidation, or coercion" need not be reached. Absent an actual deprivation of a constitutional right, the MCRA claim must fall with the § 1983 claim.

### B. *Conspiracy Claims: 42 U.S.C. § 1985 and Civil Conspiracy*

■ The § 1985 claim may be disposed of quickly. The longstanding rule of *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), requires a class or race-based discriminatory animus to underlie conspiracies violative of § 1985(3). *Id.* at 102, 91 S.Ct. at 1798. *See also, Springer v. Seaman* 821 F.2d 871, 880 (1st Cir.1987). In this case, no such class or race-based animus was alleged. The Supreme Court has refused to extend § 1985(3) and specifically declined to protect union activity with this statute in *United Broth. of Carpenters and Joiners of America, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 834–839, 103 S.Ct. 3352, 3359–3362, 77 L.Ed.2d 1049 (1983). Summary judgment must be granted on this claim.

### C. *Conspiracy*

■ Due to the rulings on the federal claims giving rise to this court's jurisdiction, the state law claims could be dismissed as a matter of discretion. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Nonetheless, analysis of these claims is included in the interest of judicial efficiency.

■ To prevail on the civil conspiracy claim, plaintiff must show that Mayor Hamilton was part of a "combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages' " to the plaintiff. *Earle v. Benoit,* 850 F.2d 836, 844 (1st Cir.1988) (citing *Hampton v. Hanrahan,* 600 F.2d 600, 620–621 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); and *Rotermund v. U.S. Steel Corp.,* 474 F.2d 1139 (8th Cir.1973)).

■ Again, the record does not support this claim. Plaintiff's allegations of conspiracy rest solely on the depositions of Captains Paquette and Donoghue; neither statement

offers sufficient evidence to support a conspiracy claim.

The only evidence that Hamilton spoke with Attorney Johnson about firing Therrien comes from the deposition of Captain Paquette, who stated that Johnson said Hamilton wanted to fire Therrien if he "does anything worthy of getting fired." Deposition of Paquette at 18. Even assuming Mayor Hamilton did speak with Attorney Johnson on this matter, there has been no illegal act. The Mayor of Holyoke, who has the authority to fire police officers, has a legal and legitimate interest in wanting to know if a police officer does anything "worthy of getting fired," especially where the officer has a history of civilian complaints, even if unproven. If Hamilton did speak with Johnson about Therrien's employment prior to July 17, 1991, the purpose was lawful and the means—speaking with Therrien's superiors—were lawful as well. In sum, the deposition of Paquette cannot be made to support the conspiracy claim.

The deposition of Captain Donoghue does not even implicate Mayor Hamilton. Donoghue states that Johnson told him he got the news of Hamilton's intent from Chief Wagner. Deposition of Donoghue at 13. This kind of evidence is insufficient as a matter of law to support a claim of conspiracy.

In sum, whether the court examines the deposition of Captain Paquette, the deposition of Captain Donoghue, or both together, an essential element of the charge of civil conspiracy is missing: unlawful action, and an agreement among parties to inflict a wrong against another. *Earle v. Benoit*, 850 F.2d at 844. Since a jury could not find for plaintiff without speculation and conjecture, summary judgment must be granted.

D. *Intentional Infliction of Emotional Distress*

■■■■■ A defendant is liable for this tort if he, intentionally and without privilege, through extreme or "outrageous" conduct, caused plaintiff to experience severe emotional distress. *Agis v. Howard Johnson Co.*, 371 Mass 140, 355 N.E.2d 315 (1976). "Outrageous" conduct has been defined as "extreme," "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." *Id.*, at 145, 355 N.E.2d 315; *George v. Jordan Marsh Co.*, 359 Mass. 244, 254–255, 268 N.E.2d 915 (1971). The defendant's conduct here, even if it occurred, does not come close to satisfying this standard.

## V. CONCLUSION.

For the foregoing reasons, the defendant's Motion for Summary Judgment is hereby ALLOWED on all five counts.