Alan FLETCHER, Plaintiff

v.

Daniel J. SZOSTKIEWICZ, individually and in his official capacity as mayor of the City of Holyoke, Defendant

No. CIV.A. 99–30075–KPN.

United States District Court, D. Massachusetts.

March 8, 2002.

**220**

Cornelius J. Moriarty, II, Aaron W. Wilson, Moriarty & Wilson, Holyoke, MA, for Alan Fletcher, Plaintiff.

John H. Fitz–Gibbon, Green, Miles, Lipton, White & Fitz–Gibbon, Northampton, MA, for Daniel J. Szostkiewicz, City of Holyoke, Defendants.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 42)*

NEIMAN, United States Magistrate Judge.

Captain Alan Fletcher ("Plaintiff") of the Holyoke Police Department brings this civil rights action against Daniel Szostkiewicz ("Defendant"), both individually and in his official capacity as mayor of the City of Holyoke. Plaintiff complains that Defendant, who has since left office, improperly suspended him for a period of three days for testifying at a civil service hearing and for preparing and printing a political brochure which he distributed to members of the Holyoke electorate. The complaint alleges deprivations of Plaintiff's right to engage in political activity under both the first amendment and the Massachusetts Civil Rights Act ("MCRA") and also seeks recovery for the intentional infliction of emotional distress. The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c)

Pursuant to Fed.R.Civ.P. 56, Defendant has moved for summary judgment. For the following reasons, the court will deny Defendant's motion with respect to the first amendment cause of action and that part of the emotional distress claim directed at Defendant in his individual capacity. In all other respects, Defendant's motion for summary judgment will be allowed.

### I. SUMMARY JUDGMENT STANDARD

A court may grant summary judgment pursuant to FED. R. CIV. P. 56(c) if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995). A "genuine" issue is one "that a reasonable jury could resolve ... in favor of the nonmoving party." *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995). *Accord United States v. One Parcel of Real Property, Great Harbor Neck, New Shoreham, R.I.,* 960 F.2d 200, 204 (1st Cir.1992).

Not every genuine factual conflict, however, necessitates a trial. " 'It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmov-

ant that the materiality hurdle is cleared.'" *Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 448 (1st Cir. 1997) (quoting *Martinez v. Colon*, 54 F.3d 980, 983–84 (1st Cir.1995)). At bottom, matters of law are for the court to decide at summary judgment. *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996).

## II. BACKGROUND

The background is sketched in a light most favorable to Plaintiff, the party opposing summary judgment. *See Sullivan v. Raytheon Co.*, 262 F.3d 41, 46 (1st Cir. 2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 931, 151 L.Ed.2d 893 (2002). Even so, uncontroverted material facts of record set forth by Defendant are deemed to be admitted. *See* Fed.R.Civ.P. 56(e); Local Rule 56.1.

At all relevant times, Defendant was Holyoke's duly elected mayor and Plaintiff was both a captain within the police department as well as president of the police officers' local union. On September 24, 1997, Plaintiff testified at a Massachusetts Civil Service Commission ("CSC") hearing in support of fellow police officer Joseph McCarthy. (McCarthy had requested the hearing after Defendant failed to promote him to a captain position despite the fact that McCarthy had received the highest score on the required examination.) Plaintiff testified that Defendant told him that he would never promote McCarthy as he had held a sign for Defendant's opponent in the 1995 mayoral election.

At the time of McCarthy's hearing, Defendant was running for re-election. During the campaign, in October of 1997, Plaintiff printed and distributed a brochure which was critical of Defendant for a number of reasons, including his allegedly negligent police department promotional practices. According to Plaintiff, his brochure was in response to an inaccurate and misleading report that Defendant had published as part of his re-election bid. Plaintiff's efforts notwithstanding, Defendant was re-elected on November 4, 1997.

Shortly thereafter, on November 10, 1997, the CSC issued a decision which stated that Defendant had, in fact, impermissibly bypassed McCarthy and ordered Defendant to revitalize the captain selection process. The CSC found that Defendant's actions stemmed mainly from his "political bias and retribution" and specifically referred to Plaintiff's and two other officials' "corroborating testimony under oath." The city received the CSC's decision on November 21, 1997.

On December 4, 1997, less than two weeks later, Defendant suspended Plaintiff for three days, ostensibly because his distribution of the October brochure violated the department's regulations. The letter of suspension said nothing about Plaintiff's testimony for McCarthy. Plaintiff appealed the suspension to a civil service officer who, after hearing evidence on December 12, 1997, issued a recommended finding upholding the suspension on December 18, 1997. "[Defendant]'s decision to suspend [Plaintiff] for a period of three days," the officer concluded, "[wa]s supported by 'just cause' reasons and was not arbitrary and capricious." (Docket No. 44 ("Def.'s Exhibits"), No. 13.)

Plaintiff appealed the finding to the CSC. However, in June of 1998, before the CSC could hold a hearing, the parties settled the dispute: the suspension would be reduced to a reprimand and, by November 1, 1998, would be expunged.[1] In addition, Plaintiff was to lose no pay, although he

---

1. For reasons unclear to the court, it appears that the letter of suspension was not actually removed from Plaintiff's file until September 19, 2001. (See Docket No. 58 ("Def.'s Supp. Brief"), Exhibit B ¶ 3.)

now claims to have missed overtime opportunities. On July 2, 1998, the CSC issued a final decision which recognized that, because the suspension had been reduced to a reprimand, the matter was "moot." (Def.'s Exhibit No. 14.)

Plaintiff filed the present action in state court in March of 1999. On May 12, 2000, after Defendants removed the matter to federal court, Plaintiff filed an amended complaint clarifying that the action was being brought against Defendant both individually and in his former capacity as mayor. (Docket No. 26.)

The complaint lists three counts. Count One alleges that "Defendant's conduct in suspending ... Plaintiff for testifying at [McCarthy's] hearing ... and for preparing, printing and distributing [the October] brochure, constitute[s] a violation of ... Plaintiff's right to freedom of speech as secured by the First Amendment of the United States Constitution and 42 [U.S.C.] § 1983 [ ('section 1983') ]." Count Two asserts the Defendant's actions "constitute a violation of the Massachusetts Declaration of Rights and ... the [MCRA]." Count Three contends that Defendant's conduct in suspending Plaintiff amounts to the intentional infliction of emotional distress.

In due course, Defendant moved for summary judgment and, thereafter, to strike certain material submitted in Plaintiff's opposition. (Defendant's motion to strike has been ruled on today by margin notation.) The court heard oral argument on August 27, 2001, at which time it requested additional briefing with respect to a particular theory alluded to in Defendant's memorandum of law. The parties filed supplemental memoranda in September of 2001 and Defendant filed a further supplement on October 26, 2001.[2]

## III. DISCUSSION

The court will address, in turn, Plaintiff's three counts: his first amendment claim, his MCRA claim and his claim of intentional infliction of emotional distress. In the court's opinion, the record contains sufficient facts to support the first amendment claim and that part of the emotional distress claim targeting Defendant as an individual, but summary judgment will enter for Defendant on both the emotional distress claim, insofar as it is brought against Defendant in his official capacity, and the MCRA claim.

## A. FIRST AMENDMENT

Plaintiff asserts in Count One that Defendant disciplined him because he engaged in activity protected by the first amendment. The court will address each of Defendant's summary judgment arguments with respect to this count after first considering the subject of the supplemental briefs—Defendant's assertion that the "settlement" of Plaintiff's CSC charges moots his first amendment claim under the common law maxim of *volenti non fit injuria*.

### 1. Volenti Non Fit Injuria

■ Citing *Mitchell v. Skinner*, 796 F.Supp. 1464 (N.D.Ala.1992), Defendant asserts that federal courts, in the context of section 1983 cases, have adopted the common law maxim of *volenti non fit injuria*, i.e., "[t]he principle that a person who knowingly and voluntarily risks danger cannot recover for any resulting injury." Black's Law Dictionary (7th ed.1999). *See also id.* (noting that the maxim is "[o]ften shortened to 'volenti' "); *Mitchell*, 796 F.Supp. at 1471 ("[*Volenti* ] is the concept that 'no one may maintain an action to

**2.** Although Defendant's latest supplement was filed without leave of court, the court has

considered it and determined that it adds nothing new to the analysis.

recover for an injury occasioned by an act to which he has consented.'") (quoting 1 Am.Jur.2d *Actions* § 53 (1962)). According to Defendant, the *volenti* maxim applies to Plaintiff's first amendment claim: "[Plaintiff]'s consent to the reduction of the [suspension] to a reprimand negates an essential element of his cause of action[,] giving him no cause for complaint." (Docket No. 43 ("Def.'s Brief") at 22.)[3]

At first blush, Defendant's argument has a persuasive ring. How can Plaintiff "settle" the CSC charges and agree to a reprimand and then bring the present action as if there were no settlement? Indeed, the facts of *Mitchell*, upon which Defendant relies, bear some similarity to those at issue here: the plaintiff, a public employee, consented to an adverse action (his termination subject to certain terms and conditions) and then sued under section 1983, claiming that circumstances of the deprivation violated the Constitution. Moreover, as *Mitchell* points out, "the maxim has had its broadest application in the master-servant context," has been recognized as a viable defense in a section 1983 action by at least one federal court of appeals, *see Pierson v. Ray*, 352 F.2d 213, 221 (5th Cir.1965), *modified on other grounds*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and is deeply rooted, among other places, in Massachusetts, *see, e.g., Fitzgerald v. Conn. River. Paper Co.*, 155 Mass. 155, 29 N.E. 464, 465 (1891); Warren, *Volenti Non Fit Injuria in Actions of Negligence*, 8 Harv. L.Rev. 457, 459 (1895). *See Mitchell*, 796 F.Supp. at 1471.[4]

Despite these roots, the *volenti* maxim is not widely applied. The parties cite no decision from the Supreme Court or this circuit applying the maxim. The court itself has found only scattered references to the maxim by the Supreme Court in civil cases and none applying the maxim in the context of section 1983. *See, e.g., Brown v. Gardner*, 513 U.S. 115, 119 n. 3, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994); *Seaboard Air Line Ry. v. Horton*, 239 U.S. 595, 599, 36 S.Ct. 180, 60 L.Ed. 458 (1916); *Smith v. United States*, 2 Wall. 219, 69 U.S. 219, 230, 17 L.Ed. 788 (1864). *But see Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 900, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (Scalia, J., concurring) (arguing that the *volenti* maxim ought not "be absolutely and systematically disregarded in cases involving structural protections of the Constitution"). With respect to the First Circuit, the court has located two decisions within the past one hundred years discussing the maxim, both of which involve false imprisonment claims. *See Lopez v. Aran*, 894 F.2d 16, 20 (1st Cir.1990); *Clark v. Bird*, 354 F.2d 977, 978 (1st Cir.1966).

The court need not pursue Defendant's *volenti* theory very far to conclude that the maxim does not apply to the facts of this case. Stated another way, even were the court to assume *arguendo* that the maxim may be applied to section 1983–based civil rights actions, the factual question posed by the maxim—whether Plaintiff "knowingly and voluntarily" consented to a civil rights injury, i.e., a violation of his first

---

3. The court notes that, despite the fact that the *volenti* maxim is an affirmative defense, *see Tyler v. Dowell, Inc.*, 274 F.2d 890, 898 (10th Cir.1960); Black's Law Dictionary, *supra*, it was not specifically pled in Defendant's answer. Nonetheless, the court addresses the issue as if properly pleaded.

4. As *Mitchell* notes, the legal principle underlying the maxim "has its roots in Justinian's *Codex* (529 A.D.) and *Digest* (533 A.D.) and the *Liber Sextus* of Pope Boniface VIII (thirteenth century)." *Id.*, 796 F.Supp. at 1471 n. 9 (citing Ingman, *A History of the Defence of Volenti Non Fit Injuria*, 26 Jurid. Rev. 1, 1–2 (1981)).

amendment rights—must be answered in the negative.

The December 12, 1997 civil service hearing, and Plaintiff's appeal to the CSC, addressed none of Plaintiff's civil rights allegations. Rather, the hearing officer stated at the start of the hearing that, according to state statute, Mass. Gen. L. Ch. 31, § 41, "[t]he scope of this hearing is very limited" and "[t]he only purpose that we're here for today is to determine whether or not [Defendant] had just cause to suspend [Plaintiff]." (Docket No. 56 ("Pl.'s Supp. Brief"), Exhibit 1 at 5.) He then listed a number of things which he was "not here . . . to decide," e.g., "whether or not [Defendant] has violated [Plaintiff]'s civil rights." (*Id.* at 5–6.)

It is no wonder then that Plaintiff never believed that, by agreeing to the CSC settlement, he abandoned his first amendment claim. As Plaintiff testified at his deposition, he informed the city, during CSC settlement negotiations, that he still planned on filing suit in federal court.[5] This testimony is consistent with Plaintiff's latest affidavit, signed on September 6, 2001, wherein he states that he "never intended to waive [his] civil rights claims by a resolution of [his] civil service appeal" and that the hearing officer "plainly explained to [me] . . . that his decision would not involve a violation of my constitutional rights." (Pl.'s Supp. Brief, Exhibit 3 ¶¶ 7, 8.)

In short, Defendant cannot demonstrate, as the *volenti* maxim requires, that Plaintiff knowingly and voluntarily consented to the injury of which he now complains. *See Slane v. Jerry Scott Drilling Co.*, 918 F.2d 123, 127 (10th Cir.1990) ("A subjective standard is applied in evaluating plaintiff's knowledge, comprehension and appreciation of the risk."). Accordingly, the court rejects Defendant's *volenti* argument and turns to his more substantive contentions.

### 2. Policymaker and Qualified Immunity Analysis

■ Defendant spends substantial energy with respect to two other first amendment arguments: (1) that Plaintiff was a policymaker or confidential employee who Defendant could discipline for political reasons; and (2) that, in any event, Defendant is entitled to qualified immunity with respect to Count One. The court rejects both contentions for essentially the same reasons set forth by District Judge Michael A. Ponsor in a related first amendment action brought against Defendant by McCarthy's estate. *See McCarthy v. Szostkiewicz*, 188 F.Supp.2d 64, 68–69 (D.Mass.2002).

■ To the extent Defendant disciplined Plaintiff on the basis of his political activity, such action, to quote Judge Ponsor, "was an obvious violation of [Plaintiff]'s rights under the First and Fourteenth Amendments." *McCarthy*, 188 F.Supp.3d at 68 (denying Szoztkiewicz's summary judgment motion with respect to first amendment claim of McCarthy who was denied captain position). As Judge Ponsor explained, "[t]he Supreme Court made it clear in *Rutan v. Republican Party of Ill.*,

---

5. Plaintiff testified as follows:
Q. You told [Edward Mitnik, an attorney for the city,] before the [CSC] complaint was dismissed that you were still going to keep your options open?
A. Correct.

. . . . .

Q. What did you say?

A. I said, "This is not the end of it."

. . . . .

Q. What else did you say?
A. I said, "We're going to go to federal court."
(Def.'s Exhibit No. 15 at 113–14.)

497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), that '[discipline] based on political affiliation or support [is] an impermissible infringement on the First Amendment rights of public employees.'" *Id.* (quoting *Rutan,* 497 U.S. at 75, 110 S.Ct. 2729, and citing *Padilla–Garcia v. Guillermo Rodriguez,* 212 F.3d 69, 74 (1st Cir.2000)).[6]

Furthermore, as Judge Ponsor held, "[Defendant]'s argument that he is entitled to qualified immunity because [Plaintiff]'s right was not 'clearly established' under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), is unsupportable in light of *Rutan.*" *McCarthy* at 68. *Rutan,* as Judge Ponsor pointed out, was decided well before the events at issue and "could not have been clearer: absent some exceptional circumstance, the First Amendment is offended when a public employee [suffers a significant employment deprivation] because of his political affiliations." *Id.* (citing *Rutan,* 497 U.S. at 75, 110 S.Ct. 2729).

The only potentially analytical difference between the case at bar and *McCarthy* is that Plaintiff, unlike McCarthy, is alleged by Defendant to have been a policymaker or a confidential employee, that is, more than simply a captain. *See McCarthy* at 69 (acknowledging that "Szostkiewicz might be entitled to qualified immunity if the record contained evidence that the position of police captain was a 'policy-making position'") (quoting *Duriex–Gauthier v. Lopez–Nieves,* 274 F.3d 4, 9 (1st Cir. 2001)). In this vein, Defendant observes that Plaintiff was also the union president, head of the department's Bureau of Administration which oversaw an $8 million budget, in charge of the administration and spending of grant money, a supervisor of forty-five employees and the self-described "second-in-command" of the department. Defendant also notes that the police chief considered Plaintiff, although not technically the "Deputy Chief," to be his "right hand man" and the representative to the mayor in the chief's absence.

As the First Circuit has observed (in yet another Holyoke police department case), the Supreme Court does allow governmental bodies to engage in "patronage practices" with respect to "those employees who ... make policy or occupy positions of confidence." *Wagner v. Devine,* 122 F.3d 53, 56 (1st Cir.1997) (citing *Elrod v. Burns,* 427 U.S. 347, 372, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 517–18, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980)). In determining whether a particular position crosses this threshold, "a court's function ... is to do what courts are often called upon to do-to weigh all relevant factors and make a common sense judgment in light of the fundamental purpose to be served." *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 242 (1st Cir.1986). "Among the indicia that locate a job along the spectrum between policymaker and clerk are: relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials and responsiveness to partisan politics and political leaders." *Id.* at 242 (citation and internal quotation marks omitted).

Unfortunately for Defendant, Plaintiff—despite his high rate of pay and

**6.** While Judge Ponsor was concerned only with "promotions," *Rutan* makes clear that certain "less harsh," politically-based discipline is also prohibited. *Id., 497* U.S. at 75, 110 S.Ct. 2729. *See also Schuler v. City of Boulder,* 189 F.3d 1304, 1309 (10th Cir.1999) (noting that *Rutan* also applies to suspensions and reprimands).

significant responsibilities within the department—has submitted sufficient evidence, at least for summary judgment purposes, to show that he was neither a policymaker nor a confidential employee. For one thing, Plaintiff was at all times a civil service worker and, under state law, Mass. Gen. L. ch. 31, § 41, could only be disciplined for "just cause." *Compare Elrod,* 427 U.S. at 350, 96 S.Ct. 2673 (upholding patronage dismissal of "non civil service employees" who were "not covered by any statute, ordinance, or regulation protecting them from arbitrary discharge"). As the Massachusetts Supreme Judicial Court has long recognized, "[t]he purpose of civil service legislation was to protect efficient public employees from partisan political control." *McNeil v. Mayor and City Council of Peabody,* 297 Mass. 499, 9 N.E.2d 566, 568 (1937). *See also Cullen v. Mayor of City of Newton,* 308 Mass. 578, 32 N.E.2d 201, 204 (1941) (similar); *City of Cambridge v. Civil Service Comm'n,* 682 N.E.2d 923, 926 (Mass. App.Ct.1997) (similar). To be sure, Plaintiff's civil service status is not dispositive, *see DiPiro v. Taft,* 584 F.2d 1, 2–3 (1st Cir.1978), but it should not be ignored, *see Gaztambide–Barbosa v. Torres–Gaztambide,* 902 F.2d 112, 113–14 (1st Cir.1990); *see also Butler v. N.Y. State Dep't of Law,* 211 F.3d 739, 744 (2nd Cir.2000).

■ In addition, the "Police Officer" and "Police Captain" job descriptions contain no hint that either position involves policymaking or political confidentiality. A "Police Officer," Plaintiff's core position, involves "general duty police work in protecting life and property through enforcement of laws and ordinances," and a "Police Captain" handles "responsible supervisory and technical law enforcement

work as [a] commanding officer of a division or major bureau of a municipal police department." (Docket No. 50 ("Pl.'s Exhibits"), No. 2(A).) Political duties are inherent in neither position. *See Roldan–Plumey v. Cerezo–Suarez,* 115 F.3d 58, 62 (1st Cir.1997) ("We have held time and again that a court, in making [a policymaker or confidential employee] determination, is to look only to the duties inherent to the position and is not to consider the actual functions of either past or present officeholders.").

Defendant does not offer competing job descriptions, but instead, relies on other facts which imply that Plaintiff, despite his various duties, did more than the average officer or captain.[7] In the court's view, these facts demonstrate, at most, that Plaintiff was entrusted with added supervisory responsibility; they do not, as a matter of law, transform him into a policymaker or confidential employee. *See Roldan–Plumey,* 115 F.3d at 62.

In summary, there are sufficient summary judgment facts to conclude that Plaintiff was neither a policymaker nor a confidential employee and that Defendant is not entitled to qualified immunity, as a matter of law, with respect to Count One. The court thus turns to Defendant's remaining first amendment arguments.

### 3. *Defendant's Remaining First Amendment Arguments*

Defendant makes three additional first amendment arguments. First, Defendant contends that Plaintiff has not satisfied section 1983's causation requirement. Second, Defendant asserts that Count One must fail in light of *Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20

---

7. Defendant also supplies a police department "Table of Organization." (Def.'s Exhibit No. 4.) However, that document reveals that Plaintiff was one of three captains, each of whom it appears supervised a separate bureau.

L.Ed.2d 811 (1968), which established a balancing test for first amendment freedom of speech claims brought by public employees. And third, Defendant argues that there is no factual basis to the allegation that Plaintiff was disciplined for testifying at McCarthy's hearing. Again, the court rejects each argument, none of which requires extensive discussion.

### a. Section 1983 Causation

■ To prevail on Count One, Plaintiff must show that Defendant, acting under color of law, deprived him of a right, privilege or immunity secured by the first amendment. *See* 42 U.S.C. § 1983; *Therrien v. Hamilton*, 849 F.Supp. 110, 114 (D.Mass.1994). As Judge Ponsor stated in *Therrien*—still another first amendment case brought by a member of the Holyoke police department—"[t]he central inquiry is whether there was, in fact, a *deprivation* of plaintiff's First Amendment rights, as required by 42 U.S.C. § 1983." *Id.*, 849 F.Supp. at 114 (emphasis in original). If no evidence of such deprivation can be found, summary judgment for the defendant is appropriate. *See id.*[8]

Citing *Therrien*, Defendant argues that Plaintiff cannot prove that his first amendment rights were deprived, noting that Plaintiff lost no pay as a result of the discipline and that, as a matter of fact, the suspension was later reduced to a mere written reprimand. In response, Plaintiff avers that he was deprived of his first amendment rights in a number of ways:

> My suspension was front-page news in the local papers. I was intimidated, embarrassed and humiliated as I worried I would receive more serious discipline if I spoke out on other Union matters. I had a long and successful career in the police department. News of my suspension was broadcast on the radio.

(Pl.'s Exhibit No. 2 ¶ 11.) He then explains: "As a result of my suspension, I suffered frequent headaches and I consulted with my physician at Medical West. I had previously suffered from hypertension but it was exacerbated by the suspension. My medication was increased four-fold." (*Id.*)[9]

Here, unlike Therrien, Plaintiff actually received the discipline; he was in fact suspended. Granted, the suspension was later changed on the books to a reprimand and Plaintiff lost no pay. Still, even a reprimand can be considered a deprivation, particularly where, as here, Defendant's actions may have chilled the future exercise of Plaintiff's first amendment rights. *See, e.g., Smith v. Fruin*, 28 F.3d

---

8. Judge Ponsor went on to find that Mayor Hamilton's *attempt* to fire Therrien so as to chill his first amendment rights did not support Therrien's "deprivation" argument. *Id.* " 'Where a chilling effect is speculative, indirect, or too remote,' " Judge Ponsor observed, " 'finding an abridgement of First Amendment rights is unfounded.' " *Id.* (quoting *Sullivan v. Carrick*, 888 F.2d 1, 4 (1st Cir.1989)). Because Therrien was never terminated but only threatened with the loss of his job, Judge Ponsor continued, "any suppositions about what might happen to his First Amendment rights if he had been or were can only be imagined." *Id.*

9. The medical evidence to which Plaintiff refers consists of two doctor's notes. The first note, dated December 9, 1997, five days after Defendant's suspension letter, states that Plaintiff was complaining of a "throbbing headache of five days duration, which occurred fairly suddenly," that he was experiencing an "exacerbation of hypertension" and that his medication should be increased. (*Id.*, Exhibit No. 31.) The second note, dated December 15, 1997, states that Plaintiff "is under a great deal of stress" and should stay out of work for a few weeks: "He is the captain of the Holyoke Fire [sic] Department and has been suspended for 3 days because of some kind of a political situation so he is under a fair amount of stress." (*Id.*)

646, 649 n. 3 (7th Cir.1994) (noting that "even minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures").[10] Moreover, unlike Therrien, there is both a physical component to Plaintiff's injuries and other possible damages as well. (See, e.g., Pl.'s Exhibit No. 2 ¶ 7 ("I lost the opportunity for overtime pay due to my suspension.").)[11] At bottom, Plaintiff has submitted sufficient evidence, for summary judgment purposes, to show a deprivation of his first amendment rights.

### b. Pickering Analysis

 Following *Pickering* and other Supreme Court precedent, the First Circuit employs a three part test to determine whether a public employee has an actionable first amendment freedom of speech claim:

> *First,* the court must determine whether [the plaintiff] made [his] statements as a citizen upon matters of public concern. [*Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).] If the speech involved matters not of public concern, "but instead ... of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id. Second,* the court must weigh the strength of the employee's and the public's First Amendment interests against the government's interest in the efficient performance of the workplace. *See* [*Pickering,* 391 U.S. at 568, 88 S.Ct. 1731.] *Third,* if the employee's and the public's First Amendment interests outweigh a legitimate governmental interest in curbing the employee's speech, [the plaintiff] must show that the protected expression was a substantial or motivating factor in an adverse employment action. *See O'Connor v. Steeves,* 994 F.2d 905, 913 (1st Cir.1993).

*Tang v. Rhode Is. Dep't of Elderly Affairs,* 163 F.3d 7, 12 (1st Cir.1998) (emphasis added). Defendant argues that the second factor, the *Pickering* element, bars Plaintiff's claim, namely, that Plaintiff's and the public's first amendment interests are weaker than Defendant's interest in the efficient performance of the workplace.[12]

Defendant's argument is misplaced. "The strong public interest in ... disclo-

---

10. To be sure, Defendant alleges in his reply memorandum that Plaintiff "remains the very vocal head of the ... union" (Docket No. 53 at 3) and, therefore, his speech has not been chilled. *See Therrien,* 849 F.Supp. at 114 (rejecting chilling argument because the plaintiff kept criticizing the mayor even after he was threatened with termination). However, because there are no facts supporting this allegation, only counsel's proffer, it must be rejected. *See* Fed.R.Civ.P. 56(c); Local Rule 56.1. Moreover, even if Defendant's allegation was properly supported, there is, as indicated, contrary evidence sufficient to raise a genuine issue of material fact with respect to the issue. (See, e.g., Pl.'s Exhibit No. 2 ¶ 11 ("I worried I would receive more serious discipline if I spoke out on other Union matters.").)

11. With respect to Plaintiff's physical symptoms, Defendant argues that the evidence demonstrates that Plaintiff has been treated for hypertension for a number of years and that Plaintiff has made no medical expert disclosure. These arguments, however, go to the weight of the evidence and are more suited for trial.

12. Defendant appropriately avoids the first and third factors. Plaintiff clearly made his statements as a citizen upon matters of public concern (the first factor) and it is undisputed that at least some of the speech was a substantial or motivating factor in the discipline (the third factor).

sures" concerning "alleged abuse of public office on the part of an elected official, a matter traditionally occupying 'the highest rung of the hierarchy of First Amendment values[,]' ... supplements [Plaintiff]'s relatively slight personal interest in speaking out, heavily weighting the *Pickering* scale in favor of First Amendment protection against retaliation for [Plaintiff]'s speech." *O'Connor*, 994 F.2d at 915–16 (quoting *Connick*, 461 U.S. at 145, 103 S.Ct. 1684). Further, there is nothing in the record to suggest that the time, manner and place of Plaintiff's speech was detrimental to the workplace. In fact, the police chief at the time in question now avers that Plaintiff's speech "had absolutely no effect on the effectiveness or the efficiency of the Holyoke Police Department's operations." (Pl.'s Exhibit No. 24 ¶ 9.)

### c. *Whether McCarthy Testimony was a Factor*

■ Finally, Defendant argues that there are no facts to support Plaintiff's allegation that his suspension was related to his testifying at McCarthy's hearing. As Defendant points out, the suspension letter makes no mention of Plaintiff's testimony and focuses exclusively on Plaintiff's publication and distribution of the October brochure. Defendant also notes that several other individuals who testified "against" Defendant at McCarthy's hearing were not disciplined.

Plaintiff, on the other hand, asks why, if Defendant was so upset with the brochure, did he not suspend him immediately? Instead, Plaintiff posits that, on December 4, 1997, Defendant was upset with the CSC's late November findings regarding McCarthy and was then reminded of Plaintiff's unfavorable testimony. Indeed, Plaintiff points out that on the very day the CSC decision was received (November 21, 1997), the city solicitor remarked to Plaintiff: "[T]he mayor is very upset about you.... [H]e wants to suspend you[, but] I advised him strongly against it." (Pl.'s Exhibit No. 1 at 47.)

In the court's view, a reasonable jury could conclude from the surrounding circumstances that Plaintiff was suspended, at least in part, for his testimony at McCarthy's hearing. Accordingly, the court rejects Defendant's final summary judgment argument with respect to Plaintiff's first amendment cause of action. Count One, therefore, will go to trial.

### B. *MCRA*

■ To establish an MCRA claim, Plaintiff must prove that his exercise or enjoyment of rights secured by the constitution or laws of either the United States or Massachusetts has been interfered with, or attempted to be interfered with, by threats, intimidation or coercion. *See* MASS. GEN. L. ch. 12, §§ 11H and 11I.[13]

---

**13.** In pertinent part, sections 11H and 11I state as follows:

> [11H:] Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation, or coercion, with the exercise and enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peacea-

> ble exercise or enjoyment of the right or rights secured.
>
> . . . . .
>
> [11I:] Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to interfere with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in

While the MCRA is the state "counterpart" to section 1983 and is basically "coextensive with" the federal statute, there are some differences. For example, to succeed on an MCRA claim, a plaintiff, unlike with section 1983, must show that the derogation of rights occurred "by threats, intimidation or coercion." *Bally v. Northeastern Univ.*, 403 Mass. 713, 532 N.E.2d 49, 52 (1989). Here, Defendant argues, Plaintiff has not sufficiently alleged "threats, intimidation, or coercion." Defendant also asserts that the MCRA claim may not be brought against the city, i.e., Defendant in his official capacity as mayor. The court agrees with both of Defendant's arguments.

### 1. *Official Liability*

 Summary judgment is warranted on the MCRA claim to the extent it targets Plaintiff in his official role as mayor. Unlike section 1983, "[i]t is now clear that 'under Massachusetts law, a municipality cannot be sued under the MCRA.'" *McCarthy*, 188 F.Supp.3d at 71 (quoting *Kelley v. LaForce*, 279 F.3d 129, 139 (1st Cir.2002)) (in turn citing *Howcroft v. City of Peabody*, 51 Mass.App.Ct. 573, 747 N.E.2d 729, 744 (2001)). *See also LeBeau v. Town of Spencer*, 167 F.Supp.2d 449, 455 (D.Mass.2001); *Metivier v. Town of Grafton*, 148 F.Supp.2d 98, 102 (D.Mass. 2001). The MCRA claim against Defendant in his capacity as mayor is clearly a claim against the city. *See McCarthy* at 71. Thus, summary judgment will be granted insofar as Plaintiff's MCRA claim is brought against Defendant in his official capacity.

### 2. *Threats, Intimidation or Coercion*

 With respect to Plaintiff's MCRA claim against Defendant as an individual, Defendant correctly observes that, in order for threats, intimidation or coercion to be found, the Supreme Judicial Court normally requires "a showing of an 'actual or potential physical confrontation accompanied by a threat of harm.'" *Carvalho v. Town of Westport*, 140 F.Supp.2d 95, 101 (D.Mass.2001) (quoting *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 631 N.E.2d 985, 989 n. 8 (1994)). *Accord McCarthy*, 188 F.Supp.2d at 69. As no actual or potential physical confrontation has been alleged here—and Plaintiff's memoranda argue nothing to the contrary—summary judgment on the entire MCRA claim would appear warranted.

Nonetheless, Chief Judge William G. Young in *Carvalho* recently "reviewed the history of cases addressing the definition of 'threats, intimidation, or coercion' under the MCRA and concluded that a physical confrontation was not always needed." *Grant v. John Hancock Mut. Life Ins. Co.*, 183 F.Supp.2d 344, 371–72 (D.Mass.2002) (Dein, USMJ) (quoting *Carvalho*, 140 F.Supp.2d at 101). Rather, Judge Young read *Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 502 N.E.2d 1375 (1987) and its progeny as providing for a " 'limited exception' to the physical confrontation requirement" where the matter " 'involves coercion through threats of breach of contract, rather than general economic coercion.'" *Id.* (quoting *Carvalho*, 140 F.Supp.2d at 102 n. 4).

Judge Ponsor too recognized the possibility of a "contractual right" exception in *McCarthy* and held there, at least for summary judgment purposes, that such a right might be wrapped up in the CSC's November 10, 1997 "decision" that Defendant had impermissibly bypassed McCarthy for a captain position. *See id.*, 2002 WL 340764,

---

said section, including the award of com-

pensatory money damages.

at \*6. Still, Judge Ponsor concluded that the issue in McCarthy's case "falls on the fringe of" the contractual right exception. *Id.* at 69.

Judge Ponsor also recognized that not all courts agree that a "contractual right" exception to the MCRA's physical confrontation requirement exists now, if ever. *See id.* (observing that "[t]he precise import of the ... language is presently unsettled" and, as Judge Young notes, the contractual right exception "has recently been under fire").[14] This court, however, need not enter into that debate. First, Plaintiff advances no such argument. *See United States v. Ramirez–Rivera,* 241 F.3d 37, 40 (1st Cir.2001) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out his arguments squarely and distinctly, or else forever hold his peace.") (citations and internal quotation marks omitted). Second, this case is clearly distinguishable from *McCarthy* where the potential for physical confrontation was present. *See id.,* at 66–67 (noting that Defendant allegedly said the following about McCarthy: "I hate him" and "Screw him"). More importantly, there is no CSC "decision" here, as distinguished from *McCarthy,* which arguably interprets a "contractual right." Rather, Plaintiff settled his grievance, thereby making the CSC proceeding "moot." Thus, unlike *McCarthy,* there is

no possibility that any contractual right is in play.

██ The court adds one final note. Plaintiff asserts that, even in the absence of a physical confrontation, the MCRA's "intimidation" requirement may also be "met by evidence of a pattern of retaliation or harassment." (Docket No. 49 ("Pl.'s Brief") at 29.) Plaintiff cites no Supreme Judicial Court or First Circuit precedent for this novel proposition, only the Massachusetts Appeals Court decision in *Howcroft,* 747 N.E.2d at 745–46 (finding with respect to MCRA claim "a genuine issue whether the defendants engaged in a pattern of harassment and intimidation in an attempt to suppress the free speech rights of [the plaintiff-police officer] regarding tobacco smoke inside the station house"), and a 1992 decision by District Judge A. David Mazzone, *Broderick v. Roache,* 803 F.Supp. 480, 487 (D.Mass.) (holding that scheme of harassment and retaliation that included disciplining police officer without cause would satisfy threats, intimidation, or coercion requirement).

In the court's view, these two cases do not advance Plaintiff's position. The first case can be read as a physical confrontation case insofar as the defendants, over a period of more than five years, continually ordered the plaintiff to "shut up," blew smoke in his face, reassigned him to increase his exposure to smoke and tried to suspend without pay and deprive him of

---

14. *See also Carvalho,* 140 F.Supp.2d at 101 (opining that "[t]he validity of this contract exception ... is questionable in light of the Supreme Judicial Court's recent recharacterization of *Redgrave* as involving not a contract dispute, but rather a physical confrontation accompanied by threats of harm") (citing *Blake,* 631 N.E.2d at 989 n. 8); *Grant,* 183 F.Supp.2d at 371–72 ("The bottom line is that there is a long history 'of shifting Massachusetts law interpreting the scope of the "threats, intimidation, or coercion" requirement.'") (quoting 140 F.Supp.2d at 100);

*Buster v. George W. Moore, Inc.,* No. 97–637–F, 2000 WL 576363, at \*21 (Mass.Super. Apr. 28, 2000) ("Those Supreme Judicial Court cases which declare that a breach of contract may be sufficient to constitute this forbidden behavior do so only under the mistaken belief that the Supreme Judicial Court in *Redgrave* permitted the case to go forward on this ground, when all that it truly did was answer certified questions in a case where a federal district court judge denied a pre-trial motion to dismiss the claim under the Act.")

benefits to which he was entitled. *How-croft*, 747 N.E.2d at 746. Here, in contrast, no physical confrontation has been alleged. The second case, *Broderick*, while arguably lacking any physical component, relies on the now criticized *Redgrave* decision, *see id.*, 803 F.Supp. at 486 (noting that "[u]ntil and unless *Redgrave* is more explicitly disavowed, this court must assume that it remains good law") (footnote omitted), which, as indicated, does not apply here. Finally, both *Howcroft* and *Broderick* clearly involve numerous instances of related objectionable conduct whereas, here, only a single suspension is at issue. Thus, even were there a "pattern" exception to the physical confrontation requirement, no such pattern has been demonstrated.[15] Accordingly, summary judgment will enter in Defendant's favor on Count Two.

### C. *Plaintiff's Intentional Infliction of Emotional Distress Claim*

■ Finally, Defendant asserts that, as a matter of law, neither he, in his official capacity, nor the city are liable for the intentional infliction of emotional distress. Plaintiff does not quibble with this assertion, but does contest Defendant's further argument that he is also entitled to summary judgment on Plaintiff's emotional distress claim against him as an individual since he did not engage in "extreme and outrageous" conduct resulting in "severe" emotional distress. *See Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315, 318–19 (1976).

■ The court believes that Plaintiff's submissions, as Judge Ponsor found in

*McCarthy*, 188 F.Supp.3d at 72, create a triable issue on these elements. As the Supreme Judicial Court has explained, "[f]rom their own experience jurors are aware of the extent and character of the disagreeable emotions that may result from the defendant's conduct." *Agis*, 355 N.E.2d at 318. Jurors will also be able to make common sense judgments, from the totality of the circumstances, about what action is "extreme and outrageous." *See id.* at 319; *Boyle v. Wenk*, 378 Mass. 592, 392 N.E.2d 1053, 1055–56 (1979). Accordingly, Defendant's motion for summary judgment with respect to Count Three will be denied insofar as it is brought against Defendant in his individual capacity.

### IV. *CONCLUSION*

For the foregoing reasons, Defendant's motion for summary judgment is ALLOWED with respect to Count Two and Count Three insofar as it is brought against Defendant in his official capacity, but DENIED with respect to Count One and Count Three insofar as it is brought against Defendant in his individual capacity. The clerk will set a date for a status conference in order to schedule further proceedings.

IT IS SO ORDERED.

■

---

**15.** Plaintiff's allegation that, in April of 1999, he was removed from his position as a "DARE" coordinator is a red herring. It is mentioned solely in Plaintiff's affidavit filed in response to Defendant's summary judgment motion and Plaintiff has never asked that it be made a part of his complaint, despite the fact that Plaintiff's amended complaint was submitted in April of 2000 and filed one month later. In any event, there are no facts even arguably tying the DARE issue to the previous year's suspension.